## PARKER v. PORT HURON HOSPITAL.

1. COURTS—STARE DECISIS. .·
   The rule of *stare decisis* establishes uniformity, certainty, and
   stability in the law, but it was never intended to perpetuate
   error or to prevent the consideration of rules of law to be
   applied to the ever-changing business, economic, and political
   life of a community.

2. SAME—NONLIABILITY OF CHARITIES FOR NEGLIGENCE.
   . The exception to the rule of *respondeat superior* that the bene-
   ficiary of the services of a charitable organization may not re-
   cover from it for damages resulting from negligence of an em-
   -ployee or agent of the charity, having been placed in the law by
   the Supreme Court, may be changed by the Court on the ground
   that it was an erroneous conclusion that put it there.

3. TORTS—CHARITIES.
   Charity is generally no defense in an action for a tortious injury.

4. CHARITIES—NEGLIGENCE OF AGENTS—SOCIAL DISTRIBUTION OF
   LOSS.
   The fact that entrusted assets might be dissipated and thereby
   thwart the intent of the donor or donors of a charity, an

---

* Continued from Volume 360.

REFERENCES FOR POINTS IN HEADNOTES · ;
[1] 14 Am Jur, Courts § 61.
[2] 14 Am Jur, Courts § 78.
[3] 10 Am Jur, Charities §§ 140–143.
   Immunity of nongovernmental charity from liability for dam-
   ages in tort. 25 ALR2d 29.
. [4] 10 Am Jur, Charities § 146.
[5] 10 Am Jur, Charities § 145.
[6, 7] 10 Am Jur, Charities § 143.
[8] 10 Am Jur, Charities § 155.
[9] 41 Am Jur Pleading § 293.
[10] 41 Am Jur, Pleading § 294.
. [11]. 15 Am Jur, Damages § 209.

argument advanced for granting immunity from liability for the negligence of agents and employees of a charity, no longer has compelling effect in view of changes in the law and in the organization and mores of community life, and the tendency of immunity to foster neglect and of liability to induce care and caution, and the tendency toward social distribution of losses.

5. SAME—BENEFICIARY—NEGLIGENCE—IMPLIED WAIVER.

The idea that the beneficiary of a charity, such as a patient in a hospital, waives any right of recourse for a negligent wrong done him is entirely fictional.

6. SAME—IMMUNITY FROM LIABILITY FOR NEGLIGENCE.

The old rule of charitable immunity from liability for the negligence of charity's agents no longer applies in view of the fact that today charity is a large-scale operation with salaries, costs, and other expenses similar to business generally and should pay its way.

7. HOSPITALS—PROSPECTIVE ABROGATION OF IMMUNITY FROM LIABILITY—CHARITIES.

A charitable, nonprofit hospital corporation is no longer 'immune from liability to patients for the negligence of its agents and servants from the time of filing the opinion overruling the previous bench-made rule of law by which such corporations were granted immunity.

8. SAME—NEGLIGENCE—EVIDENCE.

Admission of testimony in action by plaintiff husband, individually and as administrator of the estate of his wife who died in the defendant nonprofit charitable corporation's hospital because of the negligence of a laboratory technician and of other employees and doctors, *held*, proper, when allegations of error are considered in the light of the complete theory of plaintiff's case and not restricted to the negligence of the laboratory technician.

9. PLEADING—AMENDMENT—DISCRETION OF COURT.

Broad discretion rests in the trial court with reference to amendments and unless it can be shown that an abuse of the sound judgment and discretion vested in the trial judge has taken place, the Supreme Court ordinarily will not disturb the exercise of such discretion.

10. SAME—AMENDMENT—ACTION—SURPRISE—PREJUDICE.

An amendment to plaintiff's declaration was properly allowed by the trial court, where it did not create a new cause of action and did not surprise or prejudice defendant.

11. DAMAGES—DEATH—MOTHER—HYSTERECTOMY—NEGLIGENCE. ·
    Verdict of $20,000 against hospital in administrator's action for
    negligence resulting in death of 31-year-old mother of 4 chil-
    dren *held,* not excessive, where it appears she lived 13 days
    following transfusion of mismatched blood after hysterectomy
    and suffered much pain.

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from St. Clair; Streeter (Halford I.), J. Submitted January 5, 1960. (Docket Nos. 10, 11, Calendar Nos. 47,619, 47,620.) Decided September 15, 1960.

Two actions, one by Charles Parker and the other by Charles Parker, administrator of the estate of Elizabeth Catherine Parker, deceased, against Port Huron Hospital, a Michigan corporation, and others, for damages because of death resulting from the transfusion of blood of a wrong type. Actions dismissed as to hospital employees. Verdicts of no cause of action as to attending physicians and surgeons. Verdicts and judgments for plaintiff against defendant hospital. Defendant hospital appeals. Affirmed.

*William J. McBrearty* and *Covington, Davidson & Osborn,* for plaintiff.

*Moll, Desenberg, Purdy & Glover,* for defendant hospital.

*Amici Curiae:*

*Benjamin H. Long, David M. Preston* and *L. Stanford Evans, Jr.,* for Greater Detroit Area Hospital Council, Inc.

*Warner & Hart,* for Michigan Hospital Association.

KAVANAGH, J. Defendant Port Huron Hospital, a nonprofit Michigan hospital corporation, appeals from jury verdicts against it in 2 actions brought by the husband of Elizabeth Catherine Parker, deceased. Mr. Parker brought one action in his own right for out-of-pocket expenses and loss of his wife's services, and the second action as administrator of her estate for damages for her wrongful death. These actions were consolidated for trial. The verdict in the husband's action was for $548, and in the administrator's action the verdict was for $20,-000. The 2 physicians and surgeons who attended the decedent were joined as parties defendant, and verdicts of no cause for action were returned as to them. Certain hospital employees were joined as parties defendant, but the suits against them were dismissed prior to trial.

Plaintiff's wife, a 31-year-old mother of 4 children, was admitted to Port Huron Hospital on January 27, 1952, as a full-paying patient. The purpose of this hospitalization was to have performed a total hysterectomy, the operation having been previously advised by Dr. Walter S. Novak following a diagnosis by him of cancer of the cervix. Dr. Novak made all the arrangements for admission and had complete charge of the case.

Certain preoperative preparations were administered to Mrs. Parker the evening of her admission, including certain blood tests by Mrs. Jeanette Weber, a laboratory technician in Port Huron Hospital laboratory, to determine Mrs. Parker's blood type. Mrs. Weber was the only laboratory technician working that evening. She testified she was tired and overworked and that in drawing the blood sample from Mrs. Parker she didn't mark the patient's name or identification on the tube while at her bedside—she simply dropped a slip of paper around the tube. This procedure was contrary to universal standard

practice required in this and other hospitals. On the same trip to Mrs. Parker's floor to obtain her blood sample, Mrs. Weber had taken samples from 2 other patients. She returned to the laboratory with the 3 samples and commenced the work of typing the samples, but was interrupted to do an immediate blood typing for a fourth patient. On her return to the work on the first 3 samples, she confused the sample tubes and the identification slips and designated Mrs. Parker's blood type as A–RH positive rather than the correct blood type of O–RH positive.

During the operation on Mrs. Parker the following morning, she was administered one unit of type A–RH positive blood while under anesthetic. The operation was completed and the patient left the table in apparently good condition, according to the record of operation. She was removed to a ward room, where Mr. Parker was with her until approximately 11:45 a.m. At approximately 1 p.m. in the afternoon of the same day, Mr. Parker was called by telephone and requested by someone at the hospital to return because his wife "had a little bad spell." Upon his return, at about 1:30 p.m., he found her bed empty and the sheets covered with blood. He made inquiry as to her condition and was told nothing but to wait. Testimony developed that Mrs. Parker received no attention from a doctor nor any medical treatment until after 3 p.m. Dr. Novak testified that when he reached her side it was discovered the patient was in severe shock and hemorrhaging badly "without a pulse and practically dead." Subsequently, she was again taken to surgery, and while in surgery for the second time the laboratory technician's mistake with reference to the blood typing was discovered. This mistake was reported to the operating surgeons. The record of operation shows that incompatible blood and mismatching of blood had caused hemorrhagic diathesis. The second sur-

gery was completed and Mrs. Parker was returned to her room. As a result of the incompatible blood transfusion Mrs. Parker suffered a complete kidney failure or renal shutdown, lingered until the early morning hours of February 10, 1952, and died. The cause of death, as reported on the death record signed by Dr. Walter S. Novak, was "acute nephrosis (lower nephron syndrome) incompatible blood transfusion."

In connection with the pain, discomfort, and mental suffering endured by decedent during the 13 days of complicated treatment following her operations, testimony disclosed that Mrs. Parker's arms and legs were black and blue from the many injections and intravenous feedings she received; that she had a catheter in her bladder the entire time; that she was swollen and in pain and discomfort constantly until the final hours of her life, when she was thrashing, pulling her hair and screaming in pain to the point where the husband could stand it no longer and was forced to leave the hospital room. One of the complications that ended Mrs. Parker's life was pulmonary edema, resulting in handicapping her breathing, which caused her extreme apprehension and mental distress.

A lengthy trial resulted covering all the allegations of negligence with reference to the doctors, Mrs. Weber, and other hospital employees. Considerable testimony was taken upon the question of whether Port Huron Hospital was in fact a charitable institution. Plaintiff denied it was. Defendant hospital contended it met the qualifications of such an institution. The record discloses that the Port Huron Hospital was organized as a nonprofit institution under Michigan law.[1] The record further discloses that it

---

1 Organized under CL 1871, ch 105, §§ 3036–3041; reorganized under CL 1915, ch 176, §§ 9054–9062; for present law see CL 1948 and CLS 1956, § 450.117 *et seq.* (Stat Ann and Stat Ann 1959 Cum Supp § 21.118 *et seq.*).

was a completely self-sustaining institution from an operating standpoint, and that its policy is to adjust charges to patients from time to time to enable it to fully meet its operating expenses.  Defendant hospital has operating revenues exceeding $1,000,000 annually, and had assets of over $1,808,000 as of December 31, 1954.  The hospital originally was constructed by public subscription and government funds, and a recent sizable addition was financed in the same way.  The testimony discloses that the hospital is completely unrelated to the city of Port Huron except for an agreement between the two under which the city turned over to defendant a former contagious hospital with the agreement to pay $15,000 per year to the hospital for building maintenance in lieu of operating the contagious unit. In all the years for which financial figures were introduced by defendant hospital, only one year—1954 —showed an operating loss, and the hospital administrator said that was immediately taken care of by adjusting the rates upward.  While the hospital administrator claimed they admitted charity patients, he could not substantiate this, and no effort was made on the part of defendant hospital to do so. The record further discloses that many organizations pay for the patients they send to Port Huron Hospital, including State crippled children commission, St. Clair county welfare department, veterans administration, and soldiers and sailors relief fund. The hospital administrator testified that in the year 1952 he would guess approximately 65% to 70% of the patients carried hospital insurance.  The testimony further discloses that the hospital did receive some charitable contributions for operating expenses, but these were negligible as compared to receipts from patients.  Net income from patients for the year 1952, after bad debts charged off that year and prior years, amounted to $1,003,725.92; and the

operating expense contributions, other than the contribution of the city of Port Huron of $15,000, amounted to $2,163.24.

Plaintiff claims the retention of proven inefficient and incompetent employees was negligence. He also contends the conduct of Mrs. Weber in regard to failure to follow standard practice and rules with reference to attaching the name to the tube of blood was negligence. He claims the treatment following the second surgery was such as to constitute negligence of the doctor defendants. Plaintiff further alleges there was careless, inadequate, and inaccurate record keeping on the part of defendant hospital and defendant doctors in that only parts of required records were preserved and others, including the nurses' notes, were missing entirely; that hospital rules were ignored; and that provisions of the Michigan Administrative Code, which require that hospitals preserve complete medical records in every case,[2] specifically including nurses' notes, were violated.

It is admitted by defendant hospital that the negligence of one of its employees, acting within the scope of her employment, caused the death of Mrs. Parker.

Defendant hospital moved for a directed verdict at the close of plaintiff's case and at the close of all the proofs on the ground that it was immune from liability as a "charitable" institution. These motions were taken under advisement under the Empson Act.[3]

After jury verdicts were entered, defendant hospital subsequently filed motions for judgments notwithstanding the verdicts and for new trials, all of which were denied.

---

[2] See, currently, 1954 Administrative Code, § R 325.1028(8).—REPORTER.

[3] CL 1948, § 691.691 et seq. (Stat Ann and Stat Ann 1959 Cum Supp § 27.1461 et seq.).—REPORTER.

We acknowledge briefs *amici curiae* from the Greater Detroit Area Hospital Council, Inc., and Michigan Hospital Association, which have been very helpful in presenting the various legal aspects of this important case.

Defendant hospital appeals from denial of its motions for new trial, and presents 4 questions to this Court:

(1) Is a charitable organization in this State liable to a beneficiary of its services for damages resulting from negligence of an employee or agent?

(2) Was there prejudicial error in admission of testimony concerning matters having no connection with any damage or injury to decedent and the court's refusal to withdraw consideration thereof from the jury?

(3) Was the amendment to plaintiff's declaration properly allowed?

(4) Was the verdict excessive?

We would state the question with which we are faced as follows:

Where a beneficiary of a so-called charitable, nonprofit hospital sustains injuries by reason of the negligence of an employee of the hospital, may such beneficiary recover damages from the hospital?

Under a rule adopted by this Court in 1894, the beneficiary of the services of a charitable organization has been unable to recover for damages resulting from negligence of an employee or agent of the charity. This rule was established by *Downes* v. *Harper Hospital,* 101 Mich 555 (25 LRA 602, 45 Am St Rep 427). It has been uniformly sustained in the cases of *Pepke* v. *Grace Hospital,* 130 Mich 493; *Bruce* v. *Henry Ford Hospital,* 254 Mich 394; *Greatrex* v. *Evangelical Deaconess Hospital,* 261 Mich 327 (86 ALR 487); *DeGroot* v. *The Edison Institute,* 306 Mich 339; *Erwin* v. *St. Joseph's Mercy Hospital of Detroit,* 323 Mich 114.

We are now asked by appellee to abolish this rule. We are told by the defendant that we are precluded from doing so by the principle of *stare decisis;* that the rule is so firmly established in this State that it should not be altered by the Court, but that if a change should be deemed desirable "it should be done by legislative action." Defendant relies upon the following statement of Justice North in *DeGroot* v. *The Edison Institute,* 306 Mich 339, 345:

"Such a rule was adopted for the protection of those institutions and should it be desirable to depart from that rule, it should be done by legislative action."

As to the question of *stare decisis,* the same argument was made in *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697), in which this Court overruled the imputed negligence doctrine. It was again before the Court in *Sheppard* v. *Michigan National Bank,* 348 Mich 577, *Van Dorpel* v. *Haven-Busch Co.,* 350 Mich 135, and *Park* v. *Employment Security Commission,* 355 Mich 103; and has been discussed by courts, both State and Federal, for a century. All pay tribute to the important place such a doctrine must serve in our law in order to give continuity to law—the rules by which men regulate their lives, from which business finds the guidance for the management, direction, and planning of its affairs. The rule of *stare decisis* establishes uniformity, certainty, and stability in the law, but it was never intended to perpetuate error or to prevent the consideration of rules of law to be applied to the ever-changing business, economic, and political life of a community. Only in the rare case when it is clearly apparent that an error has been made, or changing conditions result in injustice by the application of an outmoded rule, should we deviate from following the established rule.

In reply to the argument that our Court, if we choose to reverse the line of legal authority with reference to so-called charitable immunity, would actually be legislating, we can only say that the exception to the common-law rule of *respondeat superior* was not, in this State, placed in our law by the legislature but by this Court. If we were to hold this exception to the rule in the previous cases erroneous, we would only be determining what the law should have been in this State, except for the erroneous conclusion reached in the line of cases relied upon by defendant hospital.

It has now been 12 years since this Court has been asked to review the question of the exemption from liability of so-called eleemosynary or charitable organizations. We believe it to be appropriate after this lapse of time—since the case of *Erwin* v. *St. Joseph's Mercy Hospital of Detroit, supra,* decided in 1948—that we should re-examine the public policy there announced in the light of present conditions and present-day thinking.

Before examining the situation in Michigan, some discussion should be had with reference to the historical background of the immunity exception and the reasons which have been advanced in its support. It should be noted that not only at the common law but also at the present time the general rule has been that one is liable for his negligence or tortious acts. The "rule" is that charity is no defense to tort. Harper, Torts, § 81, p 200 *et seq.;* Prosser, Torts, § 32, pp 194–197; 2 Restatement of Torts, §§ 323–325, pp 873–884. The immunity from suit granted charitable institutions for actions involving tortious conduct is an exception to this rule. The doctrine of immunity of charitable eleemosynary organizations from damage actions brought by beneficiaries of their service, which constitutes the present Michigan rule, is likewise an exception to the

general rule of liability. How, then, does history disclose that this immunity exception crept into the law of Michigan?

In *Downes* v. *Harper Hospital,* 101 Mich 555, Justice GRANT, relying principally on the authority of *McDonald* v. *Massachusetts General Hospital,* 120 Mass 432 (21 Am Rep 529), established the charity immunity doctrine in this State. The Massachusetts case, decided in 1876, was the first case in this country declaring charities to be immune from tort liability. It was there held that the funds of a charity are held in trust, the diversion of which courts will not permit. The Massachusetts court, as authority for establishing the rule, cited *Holliday* v. *St. Leonard's Vestry,* 11 CB NS 192 (142 Eng Rep 769), decided in England in 1861. The *Holliday Case* had followed dictum by Lord Cottenham, in *Duncan* v. *Findlater,* 6 Clark & Fin 894 (7 Eng Rep 934), handed down in 1839. In 1846, Chancellor Cottenham had uttered similar dictum in *Heriot's Hospital* v. *Ross,* 12 Clark & Fin 507 (8 Eng Rep 1508). However, the dictum of the *Duncan Case* was overruled in 1866 (*Mersey Docks Trustees* v. *Gibbs,* LR 1 HL 93 [11 HLC 686, 11 Eng Rep 1500, 14 LT 677]), and the *Holliday Case* was reversed in 1871. *Foreman* v. *Mayor of Canterbury,* LR 6 QB 214 (40 LJ QB NS 138, 24 LT 385). Thus the Massachusetts court resurrected the rule of *Holliday* v. *St. Leonard's Vestry* 5 years after it was repudiated in England.

In *Bruce* v. *Henry Ford Hospital,* 254 Mich 394, the question presented was "whether the hospital is liable to a patient for malpractice of its surgeons." This Court decided if it is a charitable organization, decision is controlled by the holding of nonliability in *Downes* v. *Harper Hospital, supra,* and *Pepke* v. *Grace Hospital, supra.* The Court then proceeded to find that the hospital was established through the benevolence of the Henry Ford family and the oper-

ating deficit was cared for in the same manner. It, therefore, found that it was a charitable organization and applied the trust theory of charitable immunity.

The decision in *Greatrex* v. *Evangelical Deaconess Hospital,* 261 Mich 327 (86 ALR 487), held that a hospital formed for nonprofit purposes and supported by the benevolence of its contributors was not liable for a nurse's mistake in giving plaintiff beneficiary's baby to another. The Court held that although the action therefor purported to be in assumpsit based on contract to properly care for the baby, it was apparent on its face that the action was one in tort. Justice Butzel in concluding his opinion in that case said (p 333):

"In directing a verdict for defendant, the trial judge correctly stated that there was no legal redress for the very grievous wrong done plaintiff; that the great good generally accomplished by a hospital and the private contributions given for its support should not be impaired or even entirely deleted by responsibility for the occasional lapses of its employees."

If any designation can be given to the reasoning of Justice Butzel in the above case, it would be that of the trust theory establishing as a matter of public policy that benevolence should not be impaired by recovery of damages for torts of the employees of the charitable trust.

In *DeGroot* v. *The Edison Institute, supra,* Justice North quoted from the opinion of the circuit judge as follows (p 344):

"The law is well settled in this State that a charitable institution is not liable to a beneficiary for the torts of its servants, *unless it was negligent in the selection and retention of the employees and the instrumentalities used by it in carrying on and furthering its benevolent purposes."* (Emphasis supplied.)

In this case plaintiff attempted to recover for injuries received when making her exit from a horse-drawn carriage at a historical museum, commonly known as Greenfield Village, which was established through the benevolence of the Ford family. The horses bolted and threw plaintiff to the ground, causing her to be injured. Here Justice North followed the trust theory as established in *Downes* v. *Harper Hospital, supra,* and followed in *Bruce* v. *Henry Ford Hospital, supra,* and sustained a judgment notwithstanding the verdict by use of the charitable immunity doctrine. It is to be noted that the Court would not apply the immunity doctrine when the institution is negligent in the selection and retention of its employees or the instrumentalities used by it in carrying on and furthering its benevolent purposes.

Justice Carpenter, writing in the case of *Bruce* v. *Central Methodist Episcopal Church,* 147 Mich 230 (10 LRA NS 74, 11 Ann Cas 150), distinguished the *Downes Case* and indicated it was limited to those who are beneficiaries of a charitable trust, and then proceeded to hold the church liable for injuries resulting to plaintiff by reason of defendant church negligently furnishing plaintiff's employer-contractor a defective scaffolding, which broke and threw plaintiff to the floor, injuring him.

In the case of *Manning* v. *Bishop of Marquette,* 345 Mich 130, the Roman Catholic bishop of the diocese of Marquette was held in tort for negligence of defendant in failing to maintain "the walkways and means of egress from the premises in a reasonably safe condition."

It is apparent the trust fund theory permeates the Michigan exception to the general rule by making charitable institutions and organizations in Michigan immune for the torts of their employees insofar as beneficiaries are concerned. Other theories used in other States and referred to in some of the Michi-

gan decisions fall into 4 groups as follows: The theory holding the doctrine of *respondeat superior* inapplicable to charitable institutions; the theory that such institutions are entitled to the rule of governmental immunity; the theory of implied waiver or assumption of risk; and the theory of public policy.

It is probably true that all these theories rest upon what some courts conceive to be sound public policy. The individual reasons for nonliability appear to be a product of rationalization. Those courts which concluded that the public interest demanded immunity for such organizations found a way for reaching this result. The reasoning behind each of these theories, the criticisms which have been leveled at them, and the extent to which they have been accepted or rejected by the courts of this country, have been exhaustively documented by Associate Justice Rutledge, writing for the court in the case of *President and Directors of Georgetown College* v. *Hughes,* 76 App DC 123 (130 F2d 810), where he said (pp 135–138):

"Liability would violate the donor's intention; misappropriate the funds to unauthorized purposes and to persons not within the intended class of beneficiaries; and in effect indemnify the trustees, if the charity is organized as a trust, against the consequences of their own or their subordinate's misconduct. More persuasive apparently, but hardly more substantial, are the frequently expressed fears that imposing liability would dissipate the fund in damages and deprive the favored class or the public of the charity's benefit. A variant is the assumed danger that donors would be deterred from creating the charity and from adding to its funds by subsequent donations. Other considerations are mentioned, but these are the principal ones.

"The confusion comes to climax when attempt is made to modify the rule in some of the ways pre-

viously mentioned and to reconcile the modifications with these reasons. It seems not to be recognized that all apply with equal force, on any basis of logic, whether the violation, misappropriation, dissipation or deterrence takes place through the negligent action of (1) the board of directors, (2) the principal or managing officers, (3) the operating superiors, as distinguished from the managers of finance and general policy, or (4) employees and representatives generally acting within their actual or apparent functions. There is the same failure to see that dissipation and deterrence also take place equally, whether damages are paid to a stranger or to a beneficiary and regardless of who falls within each class. Damage suits by employees, visitors, special nurses, physicians, and members of the general public are apt to be as frequent and as serious as those by patients. If, too, the donor's intention is controlling and he does not intend the fund to be expended for damages, but only for the purposes he specifies, the violation of his intention and the misappropriation from the objects of the trust are as great when a 'stranger' collects damages as when a patient does.

"These reasons therefore are not consistent with any of the modifications ordinarily made. They support general exemption and they negative one form or instance of immunity as much as another. The only sound arguments from them would be, first, for total immunity; second, for selection of the smallest class of claimants and the smallest or least-likely-to-be negligent group of agents or representatives, to whom and by whom liability would be incurred. The latter would reduce to the minimum the volume of dissipation and the deterrent effect, but would not escape, in a logical sense, violation of the donor's intention or the *ultra vires* effect of so applying the fund.

"Taking the reasons for their logical consequence —total immunity—we find them not convincing in the light of modern conditions, both in the law and in philanthropy. Whatever its form, the doctrine

óf *ultra vires,* so strong in the nineteenth century, has shrunk constantly both in the law of private corporations and in that of trusts. This is true especially concerning responsibility for tort. From authority as a controlling premise, no corporation and no trust could possibly be guilty of tort. Corporate charters and trust indentures do not authorize corporate representatives or trustees to commit assaults, libel, slander, and negligent torts. But authority has given way to *respondeat superior* and 'course of employment,' for reasons not necessary to restate, in the highly organized society of this century. The surrender has been greater by corporations than by trusts, but with the latters' advent into business the old lines of limitation have been shaken. Breaches have been made too in the trustee's inability to secure indemnity from the fund and in the claimant's inability to reach it. Apart from charity organized in trust or corporate form, the law of *ultra vires* action as defeating liability has moved on from *authorized* action to conduct incidental to the enterprise and the actual or apparent function of the actor as the line of demarcation. There is no longer the same broad climate of exemption as existed when the 'rule' of immunity for charitable institutions took form. Nor is the law of negligence in its swaddling clothes as it was then.

"There are also reasons which take force away from the fears of dissipation and deterrence of donations. No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in States which impose full or partial liability than where complete or substantially full immunity is given. Nor is there evidence that deterrence of donation has been greater in the former. Charities seem to survive and increase in both, with little apparent heed to whether they are liable for torts or difference in survival capacity.

"Further, if there is danger of dissipation, insurance is now available to guard against it and prudent management will provide the protection. It is high-

ly doubtful that any substantial charity would be destroyed or donation deterred by the cost required to pay the premiums. While insurance should not, perhaps, be made a criterion of responsibility, its prevalence and low cost are important considerations in evaluating the fears, or supposed ones, of dissipation or deterrence. What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets.

"Against this, we weigh the cost to the victim of bearing the full burden of his injury. In line with this view may be mentioned the general extension of workmen's compensation acts and social security legislation to include the employees of charitable institutions. Also, as some of the more recent cases point out, much of modern charity or philanthropy is 'big business' in its field. It therefore has a capacity for absorption of loss which did not exist in the typical nineteenth century small hospital or college. While the larger hospitals generally are not operated for profit, much of their revenue comes from paying patients, who are either not at all or are only partially beneficiaries on a charitable basis. To that extent, perhaps, the institutions should not be regarded as charitable and the paying patient, if he is injured and cannot recover, pays twice that others may have healing where he has injury.

"Finally, in recent years the real deterrents to donation have been taxation, despite contrary inducements in deductions, and the fears of persons well placed for the future of large individual accumulations of property, arising from economic trends much more fundamental than making charitable institutions liable for their torts.

"The chief arguments, therefore, for sustaining the immunity, namely, *ultra vires* action marked out by authority or intent of the donor and danger of destroying or preventing the creation of charitable institutions, no longer have, if they ever had, com-

pelling effect. Changes in the law and in the organization and mores of community life have taken away their major force. That is true, whether for full or for modified immunity.

"As against the factors favoring it, may be mentioned the tendency of immunity to foster neglect and of liability to induce care and caution; the departure from the general rule of liability; the anomaly of exempting charitable corporations and trust funds, when charity is not a defense to others; the injustice of giving benefit to some at the cost of injury to others and of the injured individual's having to bear the loss wrongfully inflicted upon him, at a time when the direction of the law is toward social distribution of losses through liability for fault, liability without fault, and legislation which gives the person disabled to work what is commonly but inaccurately called 'social' security. There are others we do not stop to mention.

"It is hardly necessary to discuss the various theories of exemption or their application in various modifications. Whether immunity be founded on the 'trust fund' theory, the rule of *respondeat superior,* so-called 'public policy,' or the more indefensible doctrine of 'implied waiver,' is not for us a controlling consideration. At bottom, except possibly for the last, these come down to the same thing, supported by the same considerations. They are merely different names for the same idea, cast according to the predilection of the user for technical or for broader terminology. The 'trust fund theory' comprehends all that is involved in 'public policy,' with only an apparent difference in approach. This is true likewise of *'respondeat superior'* and 'implied waiver.' In any event the result is a departure from general, and we think right, principles of liability. The differences in foundation do not affect even the extent of the departure. We think it should be complete and that charitable corporations should respond as others do for the wrongs inflicted by persons who act in their behalf about their business and

within the course of their duties, actual or apparent. Immunity, whether full or partial, is to be granted only when compelling reason requires it. If there has been, there is no longer such reason."

Justice Rutledge went on to say (pp 138–140):

"We think it does not matter whether the plaintiff is a stranger or beneficiary. Whether the one or the other is denied recovery, the distinction is without justice or legal justification. To give it to a stranger but not to a beneficiary makes the latter accept succor at the risk of greater harm. When it occurs he bears a burden which should fall on all alike, not on him alone. On the other hand, no one has the right to have cure or care at the cost of harm inflicted upon another. To allow recovery to the beneficiary, but deny it to the stranger, would unload on the latter in some part not only the cost of care and cure, but the cost of injury to the former.

"Furthermore, it is not easy to hew to the line and the chips do not fall consistently where they should lie. The distinction is not tenable upon any of the foundations asserted to support the immunity. Because the court's division is on this line, we spell out the matter, though others have done it beyond need of repetition.

"If immunity is founded on some form of *ultra vires* premise, there is no room for treating strangers and beneficiaries differently. Paying damages 'violates the donors [assumed] intention' and 'misappropriates the fund to unauthorized purposes' as much in one case as in the other. If the matter is regarded as 'diverting the fund to persons not within the class intended for aid,' it is impossible to assume that the donor intends everyone except the special object of his bounty to have reparation. If any assumption were justified, it would be exactly the contrary one. In reason the departure, in this respect, would be the greater when a stranger recovers. The person for whom the charity is founded at least is within the donor's contemplation, as the stranger may not.

be. And he is there as an object of help, not as one whose last state is to be made worse than his first. The distinction therefore applies *ultra vires* backwards and doing so undermines that narrow premise entirely.

"No more tenable foundation exists in considerations of preserving the fund, preventing its dissipation, depriving the intended class or the public of its succor, cutting off creative or sustaining donations, and the like. The reasons already stated to show that these do not support unqualified immunity apply with equal force to a limited one, whatever its form or extent. If damages dissipate the fund or deter donations, they do so equally whether paid to a stranger or to a beneficiary. When account is taken of the numbers in both classes and the probable burden of risk toward each, the heavier risk perhaps is incurred in favor of strangers.

"In hospitals, for instance, the stranger group generally includes all except patients, in some States all except nonpaying patients. Physicians, nurses, including special ones, those regularly employed and others in training, orderlies, laboratory technicians and assistants, business officers and office employees, maids, janitors, kitchen and cleaning help, all who render aid to the patient directly or indirectly, make their livelihoods doing so, and carry on the work of the institution, are within the 'stranger' class. So is the minister or priest who comes to give comfort or administer the last sacrament. Likewise the relative, friend or stranger who visits the sick. Deliverymen and others who have business to do on the premises may recover if they are injured. The ambulance driver or operator of the hospital's truck is protected, as is the person he negligently runs down on the street. All these the distinction favors at the expense of the only person the fund is created and maintained to aid. He alone is excluded. He alone enters at the risk of life and limb, of illness or injury to be aggravated, when he seeks cure, by the care-

less conduct of others who themselves are protected against like risk.

"If preservation of the fund or encouragement of donation required immunity, neither could justify the distinction. If the charity can assume the risk as to all the rest of the world and survive, it can do so for those it is designed to help. Neither the number of claims nor their amount will be greater in their behalf than for others. It is probable both would be smaller, because the class is so and because it is present in circumstances ordinarily conducive to precaution and care.

"The remaining foundations also crumble under the distinction. Inappropriate to the charitable corporation, as has been shown, is the idea that recovery in effect indemnifies the trustees against the consequences of their own or their subordinates' wrongs. It is equally so whether stranger or beneficiary is reimbursed.

"Finally, the idea of waiver is advanced, namely, that the benficiary by accepting the tendered aid impliedly agrees that is all he may accept and waives any right of recourse for wrong done, while strangers do not do so. The notion that there is any such agreement or waiver is entirely fictional. In some instances the fiction is based upon impossibility, as when a patient is unconscious from whatever cause when he enters. So, also, when he is received not by arrangement of his own but of others and has no voice or choice in the terms. Infants of tender years, if not those more mature, and insane persons have no legal capacity so to will away their rights. Nor does the ordinary conscious adult intend to do so. Usually he is ill or hurt. He does not haggle about terms. He expects care, not carelessness. Few hospitals would announce a policy of requiring such a waiver as a condition of entrance, and few patients would enter under such a condition unless forced to do so by poverty. In that case there could be no real choice. The idea of waiver, therefore, as implied from reception of benefit amounts merely to

imposing immunity as a rule of law in the guise of assumed contract or renunciation of right, when all other reasons are found insufficient to support the distinction. When the benefit turns into injury which aggravates the original ill, all basis for the waiver and all 'consideration' for it fail.

"It remains only to point out more fully the effects of the conflict in deciding who is stranger and who is beneficiary. The patient cannot recover, but the visiting spouse or parent may do so, notwithstanding he may pay the patient's bills. The visitor is an invitee, the patient is in a class worse placed than the trespasser. *Cf. Radio Cab, Inc.,* v. *Houser* (1942), 76 App DC 35 (128 F2d 604). The physician receives facilities for conducting his work. He seldom, if ever, pays for hospital connections. Often he is paid for accepting them. Without them he is worse than a ship without a rudder. Yet he is 'stranger,' not 'beneficiary.' So it is with nurses, orderlies, maids, and all who do the hospital's work. They receive livelihood from it year after year, perhaps for a lifetime, while the patient normally remains only for days or weeks. Yet they are 'strangers,' he is 'beneficiary.' Hospitals and schools are notably dependent upon income received from paying patients and students. Some pay the full cost of their care, except that overhead figured per capita for all, paying and nonpaying, makes an apparent deficiency. Others who pay only in part are beneficiaries only in part. Without these funds the institution could not operate. Beneficiaries who pay have a share in maintaining the fund and the work.

"Abolition of the immunity as to the paying patient is justified as the last short step but one to extinction. Retention for the nonpaying patient is the least defensible and most unfortunate of the distinction's refinements. He, least of all, is able to bear the burden. More than all others, he has no choice. He is the last person the donor would wish to go without indemnity. With everyone else protected, the additional burden of protecting him can-

not break the trust. He should be the first to have reparation, not last and least among those who receive it. So stripped of foundation, the distinction falls. It should fall in line with, not away from, the trend which has brought it about. The immunity should go and the object of the charity should be placed on a par with all others."

We feel that Justice Rutledge has answered most of the arguments presented by the appellant in the instant case far better than we ourselves could have done; thus this lengthy quotation.

Are the conditions and circumstances the same today as they were when the rule was established in *Downes* v. *Harper Hospital, supra,* and the later decisions of this Court? The immunity rule arose at a period in our society's development when charity typically operated on a small scale. Most gifts to charity were private, not corporate. Charitable needs were always poorly satisfied. It made sense in that period to hold that all gifts to charity should go to the purposes for which they were given, and not to outsiders who were by accident injured in the administration of the charity. This was a deliberate choice, designed to encourage gifts to charity by assuring the giver that his gift would be used as he intended.

Today charity is big business. It often is corporate both in the identity of the donor and in the identity of the donee who administers the charity. Tax deductions sometimes make it actually profitable for donors to give to charity. Organized corporate charity takes over large areas of social activity which otherwise would have to be handled by government, or even by private business. Charity today is a large-scale operation with salaries, costs, and other expenses similar to business generally. It makes sense to say that this kind of charity should pay its own way, not only as to its office expenses but

as to the expense of insurance to pay for torts as well.

The old rule of charitable immunity was justified in its time, on its own facts. Today we have a new set of facts. It is true that the new facts are still described by the same word in our English language —"charities"—but that is because our language has not changed as the facts of our life have changed. We have new facts described by old nomenclature. To say that the old rule of law still applies is to reach a result on the basis of nomenclature, not of facts; it is to apply a rule, proper in its time, to completely new facts, and to justify doing so by reference to language merely without regard to the facts.

It is our conclusion that there is today no factual justification for immunity in a case such as this, and that principles of law, logic, and intrinsic justice demand that the mantle of immunity be withdrawn. The almost unanimous view expressed in the recent decisions of our sister States is that insofar as the rule of immunity was ever justified, changed conditions have rendered the rule no longer necessary.

Since 1942, the year in which *President and Directors of Georgetown College* v. *Hughes, supra,* was decided, the following jurisdictions have abolished whatever immunity rule they previously had: Alaska; Arizona; California; Delaware; Idaho; Iowa; Kansas; Minnesota; Mississippi; New Hampshire; North Dakota; New Jersey; New York; Ohio; Puerto Rico; Vermont; and Washington.[4] Today

4 *Moats* v. *Sisters of Charity of Providence* (1952), 13 Alaska 546; *Tuengel* v. *City of Sitka* (1954), 118 F Supp 399 (D Alaska); *Ray* v. *Tucson Medical Center* (1951), 72 Ariz 22 (230 P2d 220); *Malloy* v. *Fong* (1951), 37 Cal2d 356 (232 P2d 241); *Durney* v. *St. Francis Hospital* (1951), 46 Del 350 (83 A2d 753); *Wheat* v. *Idaho Falls Latter Day Saints Hospital* (1956), 78 Idaho 60 (297 P2d 1041); *Haynes* v. *Presbyterian Hospital Association* (1950), 241 Iowa 1269 (45 NW2d 151); *Noel* v. *Menninger Foundation* (1954), 175 Kan 751 (267 P2d 934); *Swigerd* v. *City of Ortonville* (1956), 246 Minn 339 (75 NW2d 217); *Mississippi Baptist Hospital* v. *Holmes* (1952),

these and most of the other States of the nation, having abolished the immunity rule, are now governed by the general doctrine of *respondeat superior* as far as liability for torts of employees and agents of charitable corporations are concerned.

It has been suggested, in the event this Court were to overrule the immunity exception, that it should do so on a prospective basis, as was done with reference to certain other doctrines which have been overruled by this Court.[5] There can be no question of the right of this Court to make the application of the new doctrine prospective or retroactive. See discussion in opinion of Justice Cardozo in *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 US 358, 364–366 (53 S Ct 145, 77 L ed 360, 85 ALR 254).[6] However, we believe the following statement of Justice Frankfurter concurring in *Griffin* v. *Illinois*, 351

214 Miss 906, 940 (55 So2d 142, 56 So2d 709, 25 ALR2d 12); *Kardulas* v. *City of Dover* (1955), 99 NH 359 (111 A2d 327); *Rickbeil* v. *Grafton Deaconess Hospital* (1946), 74 ND 525 (23 NW2d 247, 166 ALR 99); *Collopy* v. *Newark Eye & Ear Infirmary* (1958), 27 NJ 29 (141 A 2d 276); *Bing* v. *Thunig* (1957), 2 NY2d 656 (163 NYS2d 3, 143NE2d 3); *Avellone* v. *St. John's Hospital* (1956), 165 Ohio St 467 (135 NE2d 410); *Taverez* v. *San Juan Lodge No. 972 B.P.O.E.* (1948), 68 Puerto Rico 681; *Foster* v. *Roman Catholic Diocese of Vermont* (1950), 116 Vt 124 (70 A2d 230, 25 ALR2d 1); *Pierce* v. *Yakima Valley Memorial Hospital Assn.* (1953), 43 Wash2d 162 (260 P2d 765).

These cases do not take into consideration the liability subsequently established by statute.

5 Imputed negligence rule, *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697).

See *Park* v. *Employment Security Comm.,* 355 Mich 103, and cases cited by Justice BLACK in his opinion in that case.

6 "A State in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly (*cf. Tidal Oil Co.* v. *Flanagan, supra* [263 US 444 (44 S Ct 197, 68 L ed 382)]), that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted. *Gelpcke* v. *Dubuque,* 1 Wall (68 US) 175 (17 L ed 520); *Douglass* v. *County of Pike,* 101 US 677, 687 (25 L ed 968); *Loeb* v. *Columbia Township Trustees,* 179 US 472, 492 (21 S Ct 174, 45 L ed 280); *Harris* v. *Jex,* 55 NY 421 (14 Am Rep 285); *Menges* v. *Dentler,* 33 Pa St 495, 499 (75 Am Dec 616); *Commonwealth* v. *Fidelity & Columbia Trust Co.,* 185

US 12, 25, 26 (76 S Ct 585, 100 L ed 891, 55 ALR 2d 1055), is peculiarly applicable to the instant case:

"Candor compels acknowledgment that the deci-. sion rendered today is a new ruling. \* \* \* It is much more conducive to law's self-respect to recognize candidly the considerations that give prospective content to a new pronouncement of law. That this is consonant with the spirit of our law and justified by those considerations of reason which should dominate the law, has been luminously expounded by Mr. Justice Cardozo, shortly before he came here and in an opinion which he wrote for the court. See Address of Chief Judge Cardozo, 55 Report of New York State Bar Assn., 263, 294 *et seq.*, and *Great. Northern R. Co. v. Sunburst Oil & Refining Co.*, 287

---

Ky 300 (215 SW 42); *Mason* v. *Cotton Co.*, 148 NC 492, 510 (62 SE 625, 18 LRA NS 1221, 128 Am St Rep 635); *Hoven* v. *McCarthy Bros. Co.*, 163 Minn 339 (204 NW 29); *Farrior* v. *New England Mortgage Security Co.*, 92 Ala 176 (9 So 532, 12 LRA 856); *Falconer* v. *Simmons*, 51 W Va 172 (41 SE 193). On the other hand, it may hold to the ancient dogma that the law declared by its courts had a platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning. *Tidal Oil Co.* v. *Flanagan, supra; Fleming* v. *Fleming, supra* [264 US 29 (44 S Ct 246, 68 L ed 547)]; *Central Land Co.* v. *Laidley*, 159 US 103, 112 (16 S Ct 80, 40 L ed 91); see, however, *Montana National Bank of Billings* v. *Yellowstone County, supra* [276 US 499 (48 S Ct 331, 72 L ed 673)]. The alternative is the same whether the subject of the new decision is common law *(Tidal Oil Co.* v. *Flanagan, supra)* or statute. *Gelpcke* v. *Dubuque, supra; Fleming* v. *Fleming, supra.* The choice for any State may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts. The State of Montana has told us by the voice of her highest court that with these alternative methods open to her, her preference is for the first. In making this choice, she is declaring common law for those within her borders. The common law as administered by her judges ascribes to the decisions of her highest court a power to bind, and loose that is unextinguished, for intermediate transactions, by a decision overruling them. As applied to such transactions we may say of the earlier decision that it has not been overruled at all. It has been translated into a judgment of affirmance and recognized as law anew. Accompanying the recognition is a prophecy, which may or may not be realized in conduct, that transactions arising in the future will be governed by a different rule."

See discussions in 60 Harv L Rev 437 (1947); 57 Mich L Rev 181 *et seq.*

US 358, 363–366 (53 S Ct 145, 77 L ed 360, 85 ALR 254). Such a molding of law, by way of adjudication, is peculiarly applicable to the problem at hand. The rule of law announced this day should be delimited as indicated."

In the interests of justice and fairness, in view of the new ruling and the reliance that some, albeit few, charitable, nonprofit hospital corporations may have placed on the old ruling, and may have failed to protect themselves by the purchase of available insurance, we believe the new rule should apply to the instant case and to all future causes of action arising after September 15, 1960, the date of the filing of this opinion.

It is our opinion that a charitable, nonprofit hospital organization should no longer be held immune from liability for injuries to patients caused by the negligence of its employees. Our previous decisions holding to the contrary are hereby overruled, subject to the above limitation as to this case and future cases.

We have carefully examined all the objections with reference to the admission of testimony in this case. We find that the trial court was correct in each of its rulings. Appellant's contentions are based upon the position that the entire case was confined to the negligent acts of Jeanette Weber relative to the blood sample incident. This is erroneous. The theory of plaintiff at the trial included liability for acts of negligence of the 2 doctors who were joined as parties defendant and for acts of other employees of the hospital in addition to those of the laboratory technician. When the allegations of error in regard to the testimony are considered in the light of the complete theory of plaintiff's case, the evidence appears to be material and admissible. We find no reversible error in the trial court's ruling with refer-

ence to evidence that in any way prejudices the appellant.

One of the other questions remaining to be answered is whether an amendment to plaintiff's declaration was properly allowed. Broad discretion rests in the trial court with reference to amendments. Unless it can be shown that an abuse of the sound judgment and discretion vested in the trial judge has taken place, this Court ordinarily will not disturb the exercise of such discretion. No new causes of action were created; no surprise is claimed by defendant-appellant; no prejudice to the defendant hospital appears in the record. Therefore, the authorities relied on by appellant are not applicable to the factual situation in this case.

The last question has to do with the excessiveness of the verdicts. There can be no question with reference to the verdict in favor of the husband. A discussion with respect to excessiveness of jury awards is found in the dissenting opinion of Justice SMITH in *Courtney* v. *Apple,* 345 Mich 223, 253. One of the cases discussed by Justice SMITH—that of *Hord* v. *National Homeopathic Hospital,* 102 F Supp 792, affirmed 92 App DC 204 (204 F2d 397)—upheld a jury award of $17,000 for the death of a child 3 days old. We are in no better position than the jury to place a dollar value on pain, suffering, and loss of life. We cannot say that a $20,000 verdict in the administrator's action was excessive under all the circumstances.

The judgments entered in the circuit court are affirmed, with costs to plaintiff and appellee.

SMITH, EDWARDS, and SOURIS, JJ., concurred with KAVANAGH, J.

CARR, J. (*dissenting*). Plaintiff administrator's decedent entered the defendant hospital on January

27, 1952, for surgery. A sample of her blood was taken which, unfortunately was labelled incorrectly by said defendant's employee, a laboratory technician. A blood transfusion for Mrs. Parker was deemed necessary and given. As a result of the error in labelling decedent's blood sample the wrong type of blood was used and the transfusion thereof resulted in the death of the patient.

Plaintiff brought suit against the hospital and the individual defendants who were the surgeons caring for Mrs. Parker, asserting in his declaration that the death was a result of negligence on the part of defendant hospital's employees, and on the part of said surgeons, and that said defendants were liable for damages based on such negligence. Plaintiff also sued in his individual capacity to recover damages sustained by him because of expenditures necessitated in the care and treatment of Mrs. Parker. Defendant hospital filed answers to the declarations, denying plaintiff's claims of negligence and asserting further by way of affirmative defense that it was a nonprofit charitable organization, that Mrs. Parker was a patient in its hospital and the beneficiary of its services, and that it was not subject to liability on the ground of negligence on the part of its agents, servants, or employees.

The cases were tried together. Following the introduction of proofs on the trial, the circuit judge submitted the cases to the jury, charging, insofar as the hospital was concerned, that it was liable to respond in damages if the jury concluded from the proofs that the negligence of its employee was a proximate cause of the death. The jury returned a verdict in plaintiff Parker's case against the defendant hospital in the sum of $548 and awarded in the suit brought by the administrator for damages under the death act the sum of $20,000. Motions for judgments notwithstanding the verdicts were submitted

and denied, as were motions for a new trial. The jury found that the surgeons who were defendants in the case were not liable and as to them the judgments entered accorded with such finding.

The hospital has appealed, claiming that the trial court was in error in rejecting its claim that it was exempt from liability under the facts in the case because of its status as a nonprofit charitable organization. It is further claimed on behalf of said appellant that the trial court committed prejudicial error in admitting, over objection, testimony relating to the claimed incompetence of an employee of the hospital not shown to have had any connection with the treatment of Mrs. Parker or the erroneous labelling of the blood sample which resulted in the use of an improper type of blood in the transfusion. Mr. Justice Kavanagh has written for affirmance of the judgments on the theory that institutions of the character of the defendant should be held liable for acts of negligence on the part of their employees, notwithstanding that they are nonprofit and charitable organizations, and that the rule that has heretofore obtained in Michigan of nonliability for such cause should be abrogated by this Court. With such conclusion we are unable to agree.

The record before us clearly establishes that the Port Huron Hospital is a nonprofit organization and that it comes fairly within the scope of the concept of a charitable institution. The evidence offered on the trial in circuit court in this respect was not controverted. In its behalf attention is called to the fact that in 1948 an agreement was made between the hospital and the city of Port Huron whereby the contagious disease hospital of the municipality was taken over by the appellant and conducted as a part of its facilities. It is argued that this transaction amounted to an unequivocal recognition as to the public purposes and services of the appellant. It

appears also that in recent years its facilities have been enlarged and equipped at a total cost of more than $650,000. Of such sum approximately $400,000 was raised by popular subscription, and grants were made by the Federal government of about $200,000. It further appears that the hospital has received additional contributions, charitable in nature, from the Ford Foundation and from other sources, the total amount thereof, as shown by the proofs, approximating the sum of $300,000. Because of such assistance appellant has been able to extend its services to render a larger measure of benefits to the people of the community.

It has been uniformly recognized by the courts of this State up to the present time that an organization of the character of the defendant, formed and maintained with no purpose of private gain but to the end that those in need of surgical and medical attendance might receive proper treatment, and deriving a part of its resources from charitable gifts, cannot be held liable for injuries to a patient on the ground of negligence on the part of an employee or employees. In *Downes* v. *Harper Hospital,* 101 Mich 555 (25 LRA 602, 45 Am St Rep 427), this Court unequivocally recognized that such was the law of Michigan. In that case plaintiff's decedent, while being cared for and treated by the hospital for a mental ailment, committed suicide by throwing himself out of a window from which he had managed to tear out a protective grating. There, as in the case at bar, it appeared that the defendant was organized not for private gain but for the proper treatment and care of those needing medical assistance. It was the recipient of property and funds given to it to enable it to carry out the purposes for which it was formed as an eleemosynary institution. It was recognized that money or property so received constituted a trust fund to be used solely for the purposes for

which it was given.   Since the holding in this case has been followed in subsequent decisions, we quote from the opinion as follows (pp 559, 560):

"If the contention of the learned counsel for the plaintiff be true, it follows that the charity or trust fund must be used to compensate injured parties for the negligence of the trustees, or architects and builders, upon whose judgment reliance is placed as to plans and strength of materials; of physicians employed to treat patients; and of nurses and attendants.   In this way the trust fund might be entirely destroyed, and diverted from the purpose for which the donor gave it.   Charitable bequests cannot be thus thwarted by negligence for which the donor is in no manner responsible.   If, in the proper execution of the trust, a trustee or an employee commits an act of negligence, he may be held responsible for his negligent act; but the law jealously guards the charitable trust fund, and does not permit it to be frittered away by the negligent acts of those employed in its execution.   The trustees of this fund could not by their own direct act divert it from the purpose for which it was given, or for which the act of the legislature authorized the title to be vested in the defendant.   It certainly follows that the fund cannot be indirectly diverted by the tortious or negligent acts of the managers of the fund, or their employees, though such acts result in damage to an innocent beneficiary.   Those voluntarily accepting the benefit of the charity accept it upon this condition.

"The fact that patients who are able to pay are required to do so does not deprive the defendant of its eleemosynary character, nor permit a recovery for damages on account of the existence of contract relations.   The amounts thus received are not for private gain, but contribute to the more effectual accomplishment of the purpose for which the charity was founded.   The wrong-doer, in a case of injury, but not the trust fund, must respond in damages.

This proposition seems too clear to require argument or authority. It is not, however, inappropriate to remark that better facilities for the care, cure, and treatment of the sick, both of the poor and of those who are able to pay, are secured by the establishment of hospitals like that of the defendant. These facilities are increased by the receipt of money from those who are able to pay in whole or in part for the benefits received. Several hospitals of this character exist in this State, founded by private munificence. Obviously, they would not have been founded if their donors had known, or ever supposed, that their charitable purposes might be thwarted by the verdicts of juries for the negligent acts of those who must necessarily be employed in the execution of the charity. The following authorities appear to sustain the above position: *Heriot's Hospital* v. *Ross,* 12 Clark & F 507 (8 Eng Rep 1508); *McDonald* v. *Massachusetts General Hospital,* 120 Mass 432 (21 Am Rep 529); *Gooch* v. *Association,* 109 Mass 558; *Perry* v. *House of Refuge,* 63 Md 20 (52 Am Rep 495); *Union Pacific R. Co.* v. *Artist* (CCA 8), 9 CCA 14 (60 F 365, 23 LRA 581)."

In connection with the decision in the *Downes Case* it is of interest to note the opinion of the Court in *Bruce* v. *Central Methodist Episcopal Church,* 147 Mich 230, 246 (10 LRA NS 74, 11 Ann Cas 150). The Court there referred, apparently with approval, to *Powers* v. *Homœopathic Hospital* (CCA 1), 47 CCA 122 (109 F 294, 65 LRA 372), in which it was held that the defendant hospital was not liable to respond in damages for the acts of its employees on the theory that there was an implied agreement between the hospital and the patient, arising from the acceptance by the latter of the defendant's services, that there should be no such liability. It is also of interest to note that the Federal court recognized that the individuals guilty of the acts of negligence might be required to respond in damages.

The *Downes Case* was followed in *Pepke* v. *Grace Hospital,* 130 Mich 493, in which it was held that the trial court was correct in directing a verdict for the defendant hospital, a charitable institution.   Like conclusion was reached in *Bruce* v. *Henry Ford Hospital,* 254 Mich 394, in which the Court quoted with approval from the opinion in *Downes* v. *Harper Hospital, supra.*   In *Greatrex* v. *Evangelical Deaconess Hospital,* 261 Mich 327 (86 ALR 487), the action of the trial court in directing a verdict in favor of defendant hospital, a Michigan nonprofit corporation, was upheld, the Court discussing the matter at some length and citing numerous decisions from other States.   The following excerpt from the opinion (p 333) fairly indicates the line of reasoning of the Court:

"In directing a verdict for defendant, the trial judge correctly stated that there was no legal redress for the very grievous wrong done plaintiff; that the great good generally accomplished by a hospital and the private contributions given for its support should not be impaired or even entirely deleted by responsibility for the occasional lapses of its employees."

In *DeGroot* v. *The Edison Institute,* 306 Mich 339, the defendant was organized as a nonprofit corporation for the dissemination of historical, scientific, sociological, and artistic information, and in general to advance the cause of education.   Plaintiff sustained a personal injury while on the premises of the defendant, as a result of falling from a horse-drawn vehicle.   The action for damages was based on the claim that there was negligence on the part of defendant's employees.   It was recognized in the case that the question as to defendant's legal status as a charitable corporation and its liability for the torts of its agents were matters to be determined by the court.   The jury returned a verdict in favor of

plaintiff which the circuit judge presiding at the trial set aside on the ground that there was no liability on the part of the defendant because of its character and the nature of the service that it was rendering to the public. In affirming the entry of judgment for defendant, it was said by Mr. Justice NORTH who wrote the unanimous opinion of the Court (p 345):

"In this jurisdiction it is well settled that eleemosynary institutions are exempt from such liability as is asserted in the instant case. Such a rule was adopted for the protection of those institutions and should it be desirable to depart from that rule, it should be done by legislative action."

In accord with the prior decisions is *Erwin* v. *St. Joseph's Mercy Hospital of Detroit,* 323 Mich 114. There the action was brought by plaintiff administratrix to recover damages for alleged improper treatment of her decedent as a patient in defendant hospital. A motion to dismiss the case was filed on the ground that defendant was a nonprofit, eleemosynary, and charitable institution which as a matter of law was not liable for the alleged torts on the part of its employees. Citing prior decisions relating to the question, the order of the trial court was affirmed. The Court declined to accept the argument of counsel that the immunity doctrine as applied to hospitals like the defendant in the case should be disregarded, saying:

"We are not convinced that the doctrine of immunity of charity hospitals from tort liability as announced in the above cases should be changed by the court."

As appears from the above cases, it has been the consistent position of this Court that the rule of immunity of nonprofit charitable institutions heretofore obtaining in this State should not be changed

by the Court, and that the matter is one, if such result is deemed desirable, for the consideration of the legislature.    Involved are questions of public policy with which the law-making department of the State is concerned.    That hospitals organized as is the defendant, and carrying on their operations in the interest of the public welfare, are serving a necessary public purpose is obvious.    The practical necessity for the maintenance of adequate hospital facilities for the care and treatment of afflicted patients in need thereof is even more apparent at the present time than it has been in the past.    Basically the rule that has heretofore been observed in the State was calculated to encourage the formation and maintenance of such institutions.    The question as to whether they should be subjected to liability for acts of negligence on the part of their employees presents a matter to which careful consideration should be given.    We are in accord with the prior position taken by this Court that if any change in the rule is to be made, or if it is to be wholly abrogated, action in that regard should be taken by the legislature and not by the Court.

While not directly involved in the determination of the instant controversy, it is of interest to note that the legislature of the State has by affirmative action expressly exempted from taxation the property of organizations like the appellant.    A provision of the general property tax law found in CLS 1956, § 211.7* (Stat Ann 1959 Cum Supp § 7.7), 4th subdivision, expressly recognizes and declares the public policy of the State in this regard.    To said section there was added by PA 1952, No 54, for the purpose of obviating any question that might arise with reference to the exemption of such hospitals from taxa-

---

* Amended by PA 1958, No 190, and by PA 1960, No 155.

tion, the following inclusion in the list of declared exemptions:

"Also real estate, with the buildings and other property thereon, owned and occupied by any nonprofit trust and used for hospital or public health purposes."

The application of said provision was before this Court in *In re Dearborn Clinic and Diagnostic Hospital*, 342 Mich 673. See, also, with reference to the State policy, relating to exemptions from taxation of nonprofit organizations, *Gull Lake Bible Conference Association* v. *Township of Ross*, 351 Mich 269.

In view of the action of the legislature in exempting from taxation the property of organizations of the class to which appellant in the instant case belongs, the conclusion follows that the declared public policy of the State is to encourage the formation and operation of nonprofit charitable hospitals created and existing for the care and treatment of members of the public generally. The fact that such institutions customarily collect from patients who are able to pay for such services does not alter the situation with respect to the public nature of the hospitals furnishing such facilities. It cannot be denied that they are essential to the well-being of the public. In our opinion the matter of a change in the policy heretofore existing should be left to the legislature of the State for determination.

The trial court was in error in submitting the case to the jury on the theory that defendant hospital was liable for damages if the negligent act of an employee was a proximate cause of the death of plaintiff's decedent. The judgments should be reversed and the cases remanded to the circuit court with direc-

tions to enter there judgments in favor of the defendant hospital.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

BLACK, J., did not sit.