TAYLOR v KURAPATI

Docket No. 204908. Submitted March 10, 1999, at Detroit. Decided June
25, 1999, at 9:05 A.M.

Brandy and Brian Taylor individually, and Brandy Taylor as next
friend of their daughter, Shelby Taylor, who was born with severely
deformed limbs, brought an action in the Wayne Circuit Court
against Surender Kurapati, M.D., and United Care, Inc., doing busi-
ness as Annapolis Hospital, alleging wrongful birth and negligent
infliction of emotional distress. The plaintiffs claimed that
Kurapati, a radiologist at Annapolis Hospital, breached the applica-
ble standard of care in performing an ultrasound test during the
second trimester of Brandy Taylor's pregnancy by failing to locate
the fetus' limbs, thus depriving Brandy and Brian Taylor of the right
to decide to terminate the pregnancy, and thus subjecting them to
emotional distress from witnessing the birth of their child. The
court, Michael J. Talbot, J., summarily dismissed the claim of
wrongful birth, ruling that it was barred by the statute of limita-
tions, and summarily dismissed the claim of negligent infliction of
emotional distress on its merits. The Taylors appealed.

The Court of Appeals *held*:

Wrongful birth, the cause of action by the parents of a child with
severe birth defects against a physician who negligently fails to
inform them in a timely fashion of the risk of birth defects so as to
effectively deprive them of the opportunity to terminate the preg-
nancy, does not have a rightful place in Michigan jurisprudence and
should no longer be recognized in this case, as well as in any case
alleging wrongful birth by complaint filed after June 25, 1999, the
date of the release of the opinion in this case.

1. Allowing parents to recover damages for the cost of raising an
unwanted and disabled child would not be consistent with prece-
dent in wrongful conception or wrongful pregnancy cases (i.e.,
cases where unwanted but healthy children are born as a result of
negligence by physicians) that damages for the customary cost of
raising a child are not available because the value of the life of the
child will always outweigh the cost of raising that child to the age
of majority.

2. The nonrecognition of wrongful birth as a tort will be consistent with the nonrecognition of wrongful life as a tort (i.e., a claim brought by or on behalf of a child with birth defects who claims that, but for the negligent acts of a physician, the child would not have been born).

3. Wrongful birth as a cause of action was first recognized in Michigan in a Court of Appeals opinion that is not binding on this panel pursuant to MCR 7.215(H) because it was published before November 1, 1990. One Court of Appeals opinion published after November 1, 1990, in which the Court of Appeals observed that Michigan recognizes wrongful birth, is not binding on this panel because the observation was made in dicta. Another Court of Appeals opinion published after November 1, 1990, in which it was held that wrongful birth is a viable claim in Michigan, is not binding on this panel because it was reversed by the Michigan Supreme Court, albeit on other grounds.

4. The elimination of the tort of wrongful birth will have no effect on the federal constitutional right to abortion.

5. The tort of wrongful birth relies on the benefits rule, which has some far-reaching, and profoundly disturbing, consequences because it invites the jury to weigh the costs to the parents of a disabled child of bearing and raising that child against the benefits to the parents of the life of that child at a time when the child's potential is still unknown because it has yet to live a full life. Use of the benefits rule in wrongful birth cases could lead to eugenics, i.e., the improvement of the human species by encouraging reproduction by persons presumed to have desirable traits, and to the elimination of unfit or defective children.

6. Retroactive effect should be given to the decision in this case, considering the purpose served by the new rule, the extent of reliance on the old rule, and the effect of retroactive application on the administration of justice.

7. The Taylors' wrongful birth claim is essentially a medical malpractice claim. A medical malpractice claim accrues at the time of the act or omission that is the basis of the claim regardless of the time the plaintiff discovers or otherwise has knowledge of the claim. A medical malpractice action must be brought within two years of when the claim accrued, or within six months of when the plaintiff discovered or should have discovered the claim, whichever is later. Here, the wrongful birth claim was not filed within two years of accrual and is therefore barred by the statute of limitations.

8. Summary disposition of the claim of negligent infliction of emotional distress was properly granted because the Taylors

acknowledged that they did not see their child's deformities at or immediately after her birth.

Affirmed.

DOCTOROFF, P.J., concurring in part and dissenting in part, stated that the majority correctly determined that the wrongful birth claim is barred by the statute of limitations and that the plaintiffs had not established a claim of negligent infliction of emotional distress. However, the majority's purported abolition of the tort of wrongful birth was unnecessary and is dictum in light of the disposition of the claim on statute of limitations grounds, the only grounds briefed and argued by the parties.

1. NEGLIGENCE — WRONGFUL BIRTH.

Wrongful birth, as a cause of action by the parents of a child with severe birth defects against a physician who negligently failed to inform them in a timely fashion of the risk of birth defects so as to effectively deprive them of the opportunity to terminate the pregnancy, is no longer recognized in Michigan for complaints filed after June 25, 1999.

2. LIMITATION OF ACTIONS — MEDICAL MALPRACTICE — ACCRUAL OF CLAIMS.

A medical malpractice action must be brought within two years of when the claim accrued, or within six months of when the plaintiff discovered or should have discovered the claim, whichever is later; a medical malpractice claim accrues at the time of the act or omission that is the basis of the claim regardless of the time the plaintiff discovers or otherwise has knowledge of the claim (MCL 600.5805[4], 600.5838a[1], 600.5838a[2]; MSA 27A.5805[4], 27A.5838[1][1], 27A.5838[1][2]).

3. NEGLIGENCE — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

A plaintiff may recover for negligent infliction of emotional distress where the injury threatened or inflicted on the third person is a serious one, of a nature to cause severe mental disturbance to the plaintiff; the shock results in actual physical harm; the plaintiff is a member of the third person's immediate family; and the plaintiff is present at the time of the accident or suffers shock fairly contemporaneous with the accident.

*Bendure & Thomas* (by *Mark R. Bendure* and *Kevin P. Kavanagh*), for Brandy and Brian Taylor.

*Siemion, Huckabay, Bodary, Padilla, Morganti & Bowerman, P.C.* (by *Raymond W. Morganti*), for Surender Kurapati, M.D.

*Saurbier, Paradiso & Perrin, P.L.C.* (by *John M. Perrin* and *Mark A. Meyer*), for United Care, Inc.

Before: DOCTOROFF, P.J., and SMOLENSKI and WHITBECK, JJ.

WHITBECK, J. Plaintiffs Brandy and Brian Taylor, individually, and Brandy Taylor as next friend and mother of Shelby Taylor,[1] a minor, appeal as of right the trial court's order granting summary disposition in favor of defendants Surender Kurapati, M.D., and Annapolis Hospital with respect to their wrongful birth and negligent infliction of emotional distress claims.

With respect to their wrongful birth claim, the Taylors cite the following description of the tort of wrongful birth in *Blair v Hutzel Hosp*, 217 Mich App 502, 506-507; 552 NW2d 507 (1996), rev'd on other grounds 456 Mich 877 (1997):

> "If a physician breaches the appropriate duty under the facts of a case, and it can be established that the parents would have avoided or terminated the pregnancy, the necessary causal connection is established. The parents should recover for their extraordinary medical expenses and the extraordinary costs of raising the child, as well as the emotional harm they have suffered." [Quoting *Proffitt v Bartolo*, 162 Mich App 35, 46; 412 NW2d 232 (1987).]

With respect to their negligent infliction of emotional distress claim, the Taylors cite *Wargelin v Sisters of*

---

[1] Shelby Taylor's cause of action was presumably for "wrongful life." Michigan does not recognize a cause of action for wrongful life, and the Taylors have not raised the issue on appeal. See *Rouse v Wesley*, 196 Mich App 624, 627; 494 NW2d 7 (1992); *Proffitt v Bartolo*, 162 Mich App 35, 58; 412 NW2d 232 (1987); *Dorlin v Providence Hosp*, 118 Mich App 831, 835; 325 NW2d 600 (1982); *Eisbrenner v Stanley*, 106 Mich App 357, 367; 308 NW2d 209 (1981).

*Mercy Health Corp*, 149 Mich App 75, 80-81; 385 NW2d 732 (1986), for the proposition that "Michigan has recognized a cause of action based on negligence when a parent who witnesses the negligent infliction of injury to his or her child suffers emotional distress as a consequence."

We note that counsel for the Taylors during oral argument candidly conceded that, but for the claimed existence of the wrongful birth tort, there would be no issue relating to the statute of limitations. Thus, this case revolves around the wrongful birth tort. In this opinion, we address the basic question whether, absent legislative action, such a tort has a rightful place in our jurisprudence. We conclude that it does not. We further conclude that the Taylors failed to file their complaint within the applicable limitation period. We also conclude that the undisputed facts of this case do not support a claim of negligent infliction of emotional distress and that summary disposition was also appropriate with regard to this aspect of the case.

### I. BASIC FACTS AND PROCEDURAL HISTORY

The Taylors filed their complaint in August 1996.[2] The Taylors alleged that Brandy Taylor had a doctor-patient relationship with Kurapati, a specialist in radi-

---

[2] In late March 1996, in case number 96-617726 NH, the Taylors filed a complaint against defendants for medical malpractice. In an order dated August 12, 1996, the Taylors' claim was dismissed without prejudice for failure to comply with the statutory notice of intent provisions. The order provided that "the statutory notice provision shall expire on August 19, 1996 and plaintiff may refile its complaint on August 20, 1996 and that the Statute of Limitations is tolled through August 19, 1996." We did not receive the record for case number 96-617726 NH, and therefore we rely

ology, and Annapolis. On April 19, 1994, Brandy Taylor gave birth to the couple's daughter, Shelby Taylor. Throughout her pregnancy, Brandy Taylor had been treated by Dr. Leela Suruli. Suruli had ordered that a routine ultrasound be performed in Brandy Taylor's second trimester. The ultrasound was conducted on December 4, 1993, and interpreted by Kurapati, an agent of Annapolis. Kurapati concluded that the pregnancy was seventeen weeks along, plus or minus two weeks, and that there were no visible abnormalities with the fetus. A second ultrasound was conducted on March 16, 1994, and interpreted by another physician, Dr. M. B. Cash. Cash indicated that the baby's femurs could not be adequately identified and believed that a high resolution ultrasound could be helpful for further investigation. Suruli told Brandy Taylor that the baby had short femur bones and would merely be shorter than average. Brandy Taylor decided not to have another ultrasound. Shelby Taylor was born on April 19, 1994, with "gross anatomical deformities including missing right shoulder, fusion of left elbow, missing digits on left hand, missing femur on left leg and short femur on right." A study at the University of Michigan Hospital suggested that Shelby Taylor had femur-fibula-ulna syndrome.

In their complaint, the Taylors alleged that the standard of care in performing the initial ultrasound had been breached by Kurapati when he failed to locate

---

on the parties' briefs to supply the procedural background. That the complaint was initially dismissed is not at issue in this case.

all four limbs at the time of the ultrasound. The Taylors alleged that the ultrasound should have shown Shelby Taylor's disabilities and that the failure to reveal the disabilities deprived the Taylors of their right to make a reproductive decision regarding the pregnancy. In addition to their claim of medical malpractice, the Taylors also alleged that, because of defendants' negligence, they suffered emotional distress at witnessing the birth of their child.

In early April 1997, Annapolis filed a motion for summary disposition pursuant to MCR 2.116(C)(7), (C)(8), and (C)(10). Annapolis primarily argued that the Taylors had failed to file their complaint within the statute of limitations for medical malpractice actions. Soon thereafter, Kurapati filed a similar motion for summary disposition pursuant to MCR 2.116(C)(7), (C)(8), and (C)(10).

The trial court held a hearing regarding defendants' motions in early May 1997. The trial court concluded that the Taylors' medical malpractice claim was not timely filed and dismissed the complaint with regard to any malpractice claims. However, the trial court allowed the Taylors' claim of negligent infliction of emotional distress to go forward, because the parties had not addressed the issue in their briefs. The trial court gave defendants an opportunity to submit motions for summary disposition with regard to the negligent infliction of emotional distress claim and eventually, without oral arguments, granted defendants' motions for summary disposition of the Taylors' claim of negligent infliction of emotional distress. The

trial court also denied the Taylors' motion for reconsideration with regard to its earlier ruling regarding the statute of limitations.

## II. THE WRONGFUL BIRTH TORT

### A. THE CLOSELY ANALOGOUS BIRTH-RELATED TORTS

#### (1) INTRODUCTION

The wrongful birth tort is within a constellation of birth-related torts and is closely related to two other such torts: "wrongful conception" and "wrongful life." At the outset, however, we note that the relationship between the wrongful birth tort and other, more firmly established torts of birth-related medical malpractice is considerably more tenuous. Michigan has long recognized that causes of action exist in—and we use the cruel but evocative trial parlance with extreme hesitation—"bad baby" cases. In such cases, courts and juries have held physicians and other health professionals liable for birth- or pregnancy-related disabilities caused in whole or in part by their negligence.[3] These cases generally involve negligence occurring fairly close in time to, if not contemporaneous with, the birth itself.[4] This is unlike the wrongful birth tort that usually involves an allegation of a negli-

---

[3] See *Poet v Traverse City Osteopathic Hosp*, 433 Mich 228; 445 NW2d 115 (1989) (suit based on alleged negligence in prenatal treatment resulting in birth of baby with permanent brain damage); *May v William Beaumont Hosp*, 180 Mich App 728; 448 NW2d 497 (1989) (the defendant hospital found liable for injuries to baby due to malpractice in prenatal treatment); *Soto v Lapeer Co*, 169 Mich App 518, 520; 426 NW2d 409 (1988) (suit alleging in part that death of two-month-old baby was due to negligent use of forceps during baby's delivery).

[4] See *Proffitt, supra* at 41, n 2: "Both causes of action ["wrongful birth" and "wrongful life"] which we consider must also be distinguished from

gent failure relatively early in the pregnancy to inform the parents of the risk of birth defects. Further, these cases do not involve the intermediate step of parental action. That is, they do not involve an allegation that the negligence deprived the parents of the opportunity to terminate the pregnancy.[5] In other words, such cases are simply a typical claim of medical malpractice injuring a person. They are *not* wrongful birth claims because they involve no allegation that the baby involved should never have been born, but rather involve an allegation that, absent malpractice, the same baby would have been born without certain injuries.

Further, despite rhetorical similarities, the wrongful birth tort has little to do with "end of life" cases. These cases have their basis in a person's right to make medical decisions, grounded in the common law,[6] state statutes or state constitutions,[7] or in the federal constitutional liberty interest[8] in refusing unwanted medical treatment. In this regard, Michigan recognizes a right to withhold or withdraw life-sustaining medical treatment under the common-law doctrine of informed consent. *In re Martin*, 450 Mich 204, 215; 538 NW2d 399 (1995). Any similarity that might exist between these end of life cases and the

---

the situation where negligent injury to a normal fetus results in the birth of a child with birth defects."

[5] The phrase "terminate the pregnancy" is, of course, a euphemism; the plain English word is "abortion." Because we do not believe that the abortion cases control the issues in this matter and because the word "abortion" is so value-laden in our society, we have elected to use the euphemism except when discussing the abortion cases directly.

[6] See, e.g., *DeGrella v Elston*, 858 SW2d 698 (Ky, 1993).

[7] See, e.g., *In re Guardianship of Browning*, 568 So 2d 4 (Fla, 1990).

[8] See, e.g., *Cruzan v Director, Missouri Dep't of Health*, 497 US 261, 278; 110 S Ct 2841; 111 L Ed 2d 224 (1990).

wrongful birth tort derives not from situations involving a competent patient's right to make such medical decisions. Rather the similarity derives from situations involving a once-competent patient, who has utilized a living will[9] or other advance directive[10] or a do-not-resuscitate order[11] to proscribe certain types of treatment; a once-competent patient who has left no such instructions;[12] or a never-competent patient.[13] Generally, these situations involve the use of surrogates who have, or who seek, the power to make life or death decisions on behalf of the patient. There is, therefore, an analogy between these cases and the surrogate role of the parents in wrongful birth cases who have, but argue that the physician's negligence

---

[9] MCL 700.496; MSA 27.5496 allows an adult to designate a "patient advocate" to generally make medical decisions on behalf of the adult in the event of incapacity. However, MCL 700.496(9)(e); MSA 27.5496(9)(e) provides:

> A patient advocate may make a decision to withhold or withdraw treatment which would allow a patient to die only if the patient has expressed in a clear and convincing manner that the patient advocate is authorized to make such a decision, and that the patient acknowledges that such a decision could or would allow the patient's death.

[10] All fifty states have some form of advance directive statute. As noted in the preceding footnote, the Michigan statute allows an adult to, in writing, name a patient advocate.

[11] See Michigan Do-Not-Resuscitate Procedure Act, MCL 333.1051 *et seq.*; MSA 14.15(1051) *et seq.*

[12] See, e.g., *In re Quinlan*, 70 NJ 10; 355 A2d 647 (1976).

[13] Michigan law does not allow a surrogate decisionmaker to direct the withdrawal of life-sustaining medical treatment from a conscious, but incapacitated, patient without clear and convincing evidence that "while competent, [the patient] made a statement of his desire to refuse life-sustaining medical treatment under these circumstances." *Martin, supra* at 233-234. Likewise, we consider it unlikely that the Michigan Supreme Court would allow a surrogate decisionmaker to withdraw life-sustaining treatment from a never-competent patient. "If we are to err . . . we must err in preserving life." *Id.* at 208.

deprived them of, the right under controlling federal precedent to terminate a pregnancy.

However, the analogy is not a close one, for several reasons. First, although much of the litigation and legislative activity in the end of life area may have its roots in a fear of liability, the actions themselves do not generally arise in a tort context. Second, courts generally recognize that the right to refuse life-prolonging procedures, whether directly or through surrogates, is not an absolute one and often balance that right against the state's interests, including the interest in preserving life, preventing suicide, protecting innocent third parties, and maintaining the ethical integrity of the medical profession.[14] In wrongful birth cases, however, courts often consider these interests to be inapplicable or shunt them aside. Thus, the most fruitful comparisons for analytic purposes are to the closely analogous birth-related torts of wrongful conception and wrongful life.

### (2) WRONGFUL CONCEPTION

As Anthony Jackson outlines,[15] an action for wrongful conception, also known as wrongful pregnancy, arises where the defendant's negligent conduct failed to prevent the birth of a child in the following situations: (1) where a physician negligently performs a vasectomy or tubal ligation[16] or when a physician,

---

[14] See *Cruzan, supra* at 271, citing *In re Superintendent of Belchertown State School v Saikewica,* 373 Mass 728; 370 NE2d 417 (1977).

[15] Jackson, *Action for wrongful life, wrongful pregnancy, and wrongful birth in the United States and England,* 17 Loy, LA Int'l & Comp L J 535, 583 (1995).

[16] See, e.g., *Cockrum v Baumgartner,* 99 Ill App 3d 271; 54 Ill Dec 751; 99 425 NE2d 968 (1981). See also *Rouse, supra* at 625, 627.

pharmacist, or other health professional provides any other type of ineffective contraception, the parents conceive, and the birth of a healthy, but unplanned, baby results;[17] (2) where a physician negligently fails to diagnose a pregnancy, thereby denying the mother the choice of termination of the pregnancy at a timely stage, and the birth of a healthy, but unwanted, baby results;[18] and (3) where a physician negligently attempts to terminate the pregnancy and the birth of a healthy, but unwanted, baby results.[19] Of course, the latter two situations do not actually involve a claim that a defendant's negligence was a factor in the *conception* of the child.

As noted, this Court has recognized a cause of action for wrongful conception. According to our research, the first case definitively on point was *Troppi v Scarf*, 31 Mich App 240; 187 NW2d 511 (1971). In *Troppi*, as this Court described it in *Rouse v Wesley*, 196 Mich App 624, 628; 494 NW2d 7 (1992), the parents had seven children and decided to limit the size of their family. The Troppis' physician prescribed oral contraceptives for Mrs. Troppi but the defendant pharmacist negligently provided Mrs. Troppi with tranquilizers. Presumably as a result, Mrs. Troppi conceived and delivered an eighth, and healthy, child. *Id.* The *Troppi* panel permitted the Troppis to maintain an action for the costs[20] of raising this eighth child to the age of majority.

---

[17] See, e.g., *Troppi v Scarf*, 31 Mich App 240; 187 NW2d 511 (1971).

[18] See, e.g., *Rinard v Biczak*, 177 Mich App 287; 441 NW2d 441 (1989).

[19] See, e.g., *Miller v Johnson*, 231 Va 177; 343 SE2d 301 (1986).

[20] The specific costs that the Troppis claimed were "(1) Mrs. Troppi's lost wages; (2) medical and hospital expenses; (3) the pain and anxiety of pregnancy and childbirth; and (4) the economic costs of rearing the eighth child." *Troppi, supra* at 244.

The *Troppi* panel was careful to declare, at least initially, that it was not blazing new ground:

> Contraception, conjugal relations, and childbirth are highly charged subjects. It is all the more important, then, to emphasize that resolution of the case before us requires no intrusion into the domain of moral philosophy. At issue here is simply the extent to which defendant is civilly liable for the consequences of his negligence. In reversing and remanding for trial, we go no further than to apply settled common-law principles. [*Troppi, supra* at 244-245.]

The *Troppi* panel then reviewed the common-law concepts of breach of duty,[21] causation in fact,[22] and direct and proximate causation resulting in damages[23] and concluded:

> This review of the elements of tort liability points up the extraordinary nature of the trial court's holding that the plaintiffs were entitled to no recovery as a matter of law.[24] We have here a negligent, wrongful act by the defendant, which act directly and proximately caused injury to the plaintiffs.

---

[21] The Court found that the defendant pharmacist's conduct, in negligently supplying a drug other than the drug requested, constituted a clear breach of duty, *Troppi, supra* at 245.

[22] The Court found that "[t]he possibility that she [Mrs. Troppi] might become pregnant was certainly a foreseeable consequence of the defendant's failure to fill a prescription for birth control pills; we, therefore, could not say that it was not a proximate cause of the birth of the child." *Troppi, supra,* at 245-246.

[23] The Court found:

> The medical and hospital expenses of Mrs. Troppi's confinement and her loss of wages arose from the defendant's failure to fill the prescription properly. Pain and suffering, like that accompanying childbirth, have long been recognized as compensable injuries. [*Troppi, supra* at 246.]

[24] According to the *Troppi* panel, the trial court "declared that whatever damage plaintiffs suffered was more than offset by the benefit to them of having a healthy child." *Troppi, supra* at 244.

What we must decide is whether there is justification here for a departure from generally applicable, well-established principles of law:

"The general rule of damages in an action of tort is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or could not have been foreseen by him, provided the particular damages in respect to which he proceeds are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated. Remote, contingent, or speculative damages will not be considered in conformity to the general rule above laid down." *Van Keulen & Winchester Lumber Co v Manistee & N R Co* [222 Mich 682, 687; 193 NW 289 (1923).] [*Troppi, supra* at 246-247.]

Having declared that the issue with respect to this new tort was whether its noncreation could be justified as an *exception* to common-law principles, the *Troppi* panel concluded that there was no valid reason why the trier of fact should not be free to assess damages "as it would in any other negligence case." *Id.* at 252. Picking up speed, the *Troppi* panel plunged into a discussion of public policy (relying, in part, on its perception of "the State's advocacy of family planning," *id.* at 253) and then paused at midpoint to soundly endorse the application of the "benefits rule." See *id.* at 252-262. The Restatement as then in effect, Restatement, Torts, § 920, p 616, expressed this rule as:

Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, *the value of the benefit conferred is considered in mitigation of damages*, where this is equitable. [Emphasis supplied.]

The *Troppi* panel saw no problem in applying this rule in a wrongful conception case:

> Since pregnancy and its attendant anxiety, incapacity, pain, and suffering are inextricably related to child bearing, we do not think it would be sound to attempt to separate those segments of damage from the economic costs of an unplanned child in applying the "same interest"[25] rule. Accordingly, the benefits of the unplanned child may be weighed against all the elements of claimed damage.
>
> The trial court evidently believed, as did the court in *Shaheen v Knight, supra,*[26] that application of the benefits rule prevents any recovery for the expenses of rearing an unwanted child. This is unsound. Such a rule would be equivalent to declaring that in every case, as a matter of law, the services and companionship of a child have a dollar equivalent greater than the economic costs of his support, to say nothing of the inhibitions, the restrictions, and the pain and suffering caused by pregnancy and the obligation to rear the child.
>
> There is a growing recognition that the financial "services" which parents can expect from their offspring are largely illusory.[27] As to companionship, cases decided when "loss of companionship" was a compensable item of damage for the wrongful death of a child reveal no tendency on the part of juries to value companionship so highly as to outweigh expenses in every foreseeable case.[28]
>
> Our discussion should not be construed as an expression of doubt as to the efficacy of the benefits rule in cases like the one before us. *On the contrary, we believe that rule to*

---

[25] The "same interest" rule is another formulation of the benefits rule, whereby if the defendant's tortious conduct conferred a benefit to the same interest that was harmed by his conduct, the dollar value of the benefit is to be subtracted from the dollar value of the injury in arriving at the damages properly awardable. *Troppi, supra* at 255, citing *Burtraw v Clark*, 103 Mich 383; 61 NW 552 (1894); 22 Am Jur 2d, Damages, § 204, p 283; McCormick, Damages, § 40, p 146.

[26] 11 Pa D & C 2d 41, 45, 46 (1957).

[27] The *Troppi* panel cited no source for this conclusion.

[28] Again, the *Troppi* panel cited no source for this conclusion.

*be essential to the rational disposition of this case and the
others that are sure to follow.* The benefits rule allows flexi-
bility in the case-by-case adjudication of the enormously
varied claims which the widespread use of oral contracep-
tives portends. [*Id.* at 255-256 (emphasis supplied).]

The *Troppi* panel then brushed aside the problem of
placing a dollar value on the companionship and ser-
vices of an unwanted child. The panel stated that "dif-
ficulty in determining the amount to be subtracted
from the gross damages does not justify throwing up
our hands and denying recovery altogether," *id.* at
261, holding that a trier of fact could find a basis for
the "reasonable ascertainment of the amount of the
damages," *id.* This Court reached a similar result in
*Green v Sudakin,* 81 Mich App 545; 265 NW2d 411
(1978).[29]

However, in *Rinard v Biczak,* 177 Mich App 287;
441 NW2d 441 (1989), this Court reached a far differ-
ent conclusion. *Rinard* involved a suit by the plain-
tiffs against the defendant physician in which the
plaintiffs alleged medical malpractice for the defend-
ant's failure to diagnose Mrs. Rinard's pregnancy. At
trial, the plaintiffs testified that Mrs. Rinard probably
would have sought to terminate the pregnancy had

---

[29] In *Green,* as described by this Court in *Rouse, supra* at 628, the plain-
tiff wife requested that the defendant physician perform a tubal ligation
immediately following the birth of her third child. The defendant failed to
perform the surgery and, according to the plaintiffs, also failed to inform
the plaintiffs that the surgery had not been performed. The plaintiffs con-
sequently failed to take birth control precautions and a fourth child was
born. The plaintiffs sued the defendant, seeking in part to recover the cost
of raising the child. *Id.* The jury awarded the plaintiffs $95,000. *Green,
supra* at 547. The *Green* panel affirmed, rejecting the defendant's argu-
ment that the award of such damages would be speculative, noting that
the computation of the expense of raising a child, although difficult,
should not operate to bar recovery. *Id.* at 547-548.

the defendant properly diagnosed that pregnancy. The jury awarded the plaintiffs damages for the cost of raising their healthy child. *Id.* at 289-290. The *Rinard* panel reversed, holding that neither natural nor adoptive parents can recover the costs of "raising a normal, healthy child because those costs are outweighed by the benefits of that child's life." *Rinard, supra* at 290.

In reaching this conclusion, the *Rinard* panel observed that Michigan is among the minority of states that allow the recovery of the costs of raising a child as an element of damages, offset by the benefits received by the parents from a parent-child relationship. *Rinard, supra* at 292. The panel commented that, "[i]n a substantially greater number of jurisdictions, courts have denied the recovery of child-rearing costs." *Id.* (citations omitted). Further, "[i]t appears that the majority of states do not allow recovery of the costs of raising 'a healthy, normal child' as a element of damages in a wrongful pregnancy case."[30] The *Rinard* panel then went on to criticize the application of the benefits rule in wrongful pregnancy cases:

Courts have not allowed the recovery of the costs of raising a normal, healthy child as an element of damages for many reasons.[31] We consider the best reason to be that the costs of raising such a child are outweighed by the value of that child's life. In *Rohm v Stroud*, 386 Mich 693, 696; 194

---

[30] See anno: *Recoverability of cost of raising normal, healthy child born as result of physician's negligence or breach of contract or warranty,* 89 ALR4th 632, § 3, pp 640-644 & 1998 Supp, 89 ALR4th 632, § 3, p 13.

[31] Citing *Morris v Sanchez,* 746 P2d 184, 187-188 (Okla, 1987), and *Cockrum v Baumgartner,* 95 Ill 2d 193, 198-199; 69 Ill Dec 168; 447 NE2d 385 (1983).

NW2d 307 (1972), our Supreme Court stated that the value of a minor child's services to a parent is at least as great as the amount expended by the parent on the child's support, maintenance and education. In that wrongful death case, our Supreme Court further stated that parents are at least entitled to the presumption that a child is worth his keep, and the negligent act which snuffs out their child's life deprives them of services at least equal to the amount of their pecuniary outlay. 386 Mich 697.

The instant case does not involve a wrongful death claim. However, allowing the costs of raising a child as an element of damages logically requires the conclusion that the nonexistence of that child would be a benefit. [*Morris v Sanchez*, 746 P2d 184, 188 (Okla, 1987)]. We agree with the reasoning of the Illinois Court of Appeals which stated:

"The existence of a normal, healthy life is an esteemed right under our laws, rather than a compensable wrong. [*Wilczynski v Goodman*, 73 Ill App 3d 51, 62; 29 Ill Dec 216; 391 NE2d 479, 487 (1979).]"

In a proper hierarchy of values, the benefit of life should not be outweighed by the expense of supporting it. [*Cockrum v Baumgartner*, 95 Ill 2d 193, 201; 69 Ill Dec 168; 447 NE2d 385 (1983).] A court " 'has no business declaring that among the living are people who never should have been born.' "[32] *Proffitt, supra*, p 51, quoting *Smith v Cote*, 128 NH 231, 249; 513 A2d 341, 353 (1986).

Another reason for not allowing the recovery of childrearing costs as an element of damages is that, to maximize their recovery under the benefits rule, parents must demonstrate that they did not want their child and that the child is of minimal value to them. Michigan should not allow " 'the unseemly spectacle of parents disparaging the "value" of their children or the degree of their affection for them in open court.' " *Cockrum, supra*, p 202, quoting *Public Health*

---

[32] The phrase may have its origin in the New Testament (See Matthew, 26:24 (Holman Verse Reference Jewel Edition): "[I]t had been good for that man [Judas Iscariot] if he had not been born.") If so, the implicit comparison between Judas, the betrayer of Jesus, and the disabled is chilling.

*Trust v Brown*, 388 So 2d 1084, 1086, n 4 (Fla App, 1980).
A related concern is for the child who may learn that his
parents did not want him to exist and sued to have the per-
son who made his existence possible provide for his sup-
port. *Wilbur v Kerr*, 275 Ark 239, 242-244; 628 SW2d 568,
570-571 (1982). [*Rinard, supra* at 292-294 (citations
omitted).]

Thus, in the 1970s and 1980s, this Court reached con-
flicting conclusions concerning the value of a healthy
child's life. On the one hand, the *Troppi* and *Rinard*
panels assumed that a trier of fact could ascertain a
"reasonable" value for that life, which might or might
not exceed the expense of the child's support. On the
other hand, the *Rinard* panel concluded that the
value of that life is at least equal to the expense of
the child's support and, further, that the benefit of
that child's life should not be outweighed by the
expense of supporting it.

This Court resolved, at least partially, this conflict
in *Rouse, supra. Rouse* was unquestionably a wrong-
ful conception case in which the plaintiffs sued over
an unsuccessful tubal ligation performed on Mrs.
Rouse. *Id.* at 625-626. As in *Troppi*, presumably as a
result of the fact that the surgery was unsuccessful,
Mrs. Rouse thereafter conceived. She then delivered a
sixth, and healthy, child. While the trial court permit-
ted the plaintiffs to maintain the action for medical
costs and pain and suffering, it granted the defend-
ants summary disposition with respect to the plain-
tiffs' claim for damages for the cost of raising the
child to the age of majority, following the decision in
*Rinard, supra.* See *Rouse, supra* at 625-626. Thereaf-
ter, on the plaintiffs' motion, the trial court dismissed
the remaining counts in the complaint without

prejudice. The plaintiffs appealed, contending that the trial court should have permitted them to maintain an action for the cost of raising the child to majority as part of their suit for wrongful conception. *Id.* at 626.

The *Rouse* panel held that in the context of a wrongful conception[33] action, a plaintiff may not recover the customary cost of raising and educating the child. *Id.* at 631-632. In reaching this narrow decision, the *Rouse* panel articulated a broader concept and one that we consider to be of surpassing importance:

> As recognized by this Court on previous occasions, the subjects of reproduction, contraception, and the decision to avoid or terminate pregnancy are highly personal subjects fraught with controversy. It is therefore understandable that a conflict has arisen in decisions from this Court, as well as in other jurisdictions, with respect to whether parents may recover the customary cost of raising a child where, although the parents attempt to avoid pregnancy, conception and the birth of a child occurs as a result of the negligence of a doctor or other responsible person. We hold, however, that such recovery should not be available in Michigan.
>
> We recognize that the cost of raising a child to majority is significant and may, in certain circumstances, impose a hardship upon the child's parents. *We further recognize, however, that all human life is presumptively valuable. Simply stated, a child should not be considered a "harm" to its parents so as to allow recovery for the customary cost of raising the child.* Our Supreme Court has held in the context of wrongful death actions that the benefits of the services of a minor child to the child's parents are at least as great as the cost of raising the child to majority.

---

[33] The *Rouse* panel used the term "wrongful pregnancy." *Rouse, supra* at 632.

*Rohm [supra.]*[34] See also *Rinard, supra,* 292. *Similarly, in
the context of a wrongful pregnancy action, we hold as a
matter of law that the value of the life of a child will
always outweigh the customary cost of raising that child
to majority. The benefits rule is therefore inapplicable in a
wrongful pregnancy action.* [*Rouse, supra* at 630-631
(emphasis supplied).]

We recognize that the *Rouse* decision did *not* rule out
a wrongful conception action for medical costs and
pain and suffering. We further recognize that *Rouse*
dealt with an unwanted, *but healthy,* child while
wrongful birth actions deal with unwanted, *and dis-
abled,* children. We do *not* concede, however, that an
intermediate appellate court of this state should
implicitly endorse the view that the life of a disabled
child is worth less than the life of a healthy child. If
*all* life is presumptively valuable, *Rouse, supra* at 631,
how can we say that what we really mean is that all
lives *except for the lives of the disabled* are presump-
tively valuable? If we say that the benefits rule is
inapplicable to the lives of *healthy* children, *id.,* how
can we then continue, at least implicitly, to apply that
rule to the lives of *disabled* children? If we conclude
that in a proper hierarchy of values, the expense of
supporting life should not outweigh the benefit of
that life, *Rinard, supra* at 293, how can we say that
what we really mean is that such expense should not
outweigh the benefit of lives of healthy children, *but
can outweigh the benefit of lives of disabled chil-
dren*? If we say that a court "has no business declar-
ing that among the living are people who never

---

[34] In a footnote, the *Rouse* panel stated, "This holding would seem to
undermine the basic premise in *Troppi,* which relies upon the benefits
rule." *Rouse, supra* at 631, n 3.

should have been born," *id.*, how can we continue to say—and here virtually explicitly through the device of compensating the parents for the expenses of that "wrongful birth"—that courts *can* go about the business of declaring that living, *but disabled,* children should never have been born? To say the least, this Court's language in its partial repudiation of the wrongful conception doctrine in *Rouse* raises the most troubling of questions about the continued viability of the wrongful birth tort in Michigan.[35]

### (3) WRONGFUL LIFE

As Anthony Jackson outlines:[36]

> The claim is brought by or on behalf of the child who alleges that she was born because of the doctor's negligent failure to properly advise her parents and, as a result, has to suffer the condition. The doctor's negligent advice causes the pain, suffering, and financial hardship experienced each day by the child.
>
> The doctor has not caused the disability itself. But for the doctor's negligent acts, however, the child would not have been born and, thus, would not have suffered the ensuing condition. The parents either would have decided not to conceive or, if they became aware of the condition at a later stage, would have terminated the pregnancy in accordance with the applicable law.

In *Proffitt v Bartolo,* 162 Mich App 35; 412 NW2d 232 (1987), this Court held that the wrongful life cause of

---

[35] While consideration of some of the rationale of "wrongful conception" cases is analytically crucial to our decision, the case at hand involves a claim for "wrongful birth," not wrongful conception. Thus, we do not address the issue whether wrongful conception claims, as distinct from wrongful birth claims and as limited by *Rouse, supra,* remain tenable.

[36] Jackson, *supra* at 536-537.

action was not available in Michigan. *Proffitt* involved, in count I, the parents' action for wrongful birth. Count II, however, was the parents' action on behalf of their daughter, Maya Proffitt, alleging that she would be unable to earn any income and therefore seeking recovery for the " 'extensive medical, institutional and educational' expenses" that she would incur after reaching age eighteen. Maya Proffitt's parents also requested, on her behalf, damages for the " 'severe pain and suffering, emotional distress and pain, embarrassment and humiliation' resulting from her grave congenital deformities." *Proffitt, supra* at 39.

The underlying allegation of negligence involved the defendant physician Dr. Bartolo's treatment of Mrs. Proffitt. As the *Proffitt* panel described it:

Dr. Bartolo sent Yasmin to Mercy-Memorial Hospital in Monroe, Michigan, for studies. On February 26, 1976, the blood studies were performed, including a test for rubella. During March, 1976, Yasmin continued under Dr. Bartolo's care and complained of chronic headaches, fever, malaise, and gastrointestinal discomfort. On March 17, 1976, Dr. Bartolo again admitted Yasmin to the hospital for the treatment of a parasitic infection associated with hematemesis and headaches. Dr. Bartolo diagnosed Yasmin's condition as a whipworm infestation and discharged her from the hospital on March 19, 1976. In the following months, Yasmin continued to complain of chronic headaches, nausea, malaise, and fever to Dr. Bartolo.

David called Dr. Bartolo on June 14, 1976, to complain about Yasmin's high fever. At the end of the conversation, Dr. Bartolo advised plaintiffs that he could no longer provide professional services to them and that they should seek the services of another physician. Plaintiffs retained the services of another physician who delivered the child, plaintiff Maya S. Proffitt, on August 23, 1976.

Plaintiffs alleged numerous instances of negligent conduct on Dr. Bartolo's part. Essentially, plaintiffs alleged that Dr. Bartolo failed to exercise the required degree of care and skill in diagnosing and treating Yasmin, including a failure to take an adequate history, to employ sufficient diagnostic tests, to interpret the rubella test properly, and to order additional tests to evaluate the risk of a rubella or other infection which could cause congenital fetal malformations. Plaintiffs allege that Dr. Bartolo failed to advise them of the rubella test results, the significance of those findings and the necessity of further tests, and the risk of severe congenital fetal malformations resulting from rubella or other serious infections during Yasmin's first trimester of pregnancy. Plaintiffs also alleged that Dr. Bartolo failed to advise plaintiffs of the risks to the fetus so that plaintiffs could decide whether to terminate the pregnancy. Plaintiffs allege that, had Dr. Bartolo properly diagnosed Yasmin's condition and adequately advised them, they would have terminated Yasmin's pregnancy. Instead, Maya was born with microcephaly, mental retardation, severe bilateral eye malformations resulting in blindness, and other severe congenital malformations caused by a rubella infection or another intrauterine viral, parasitic or protozoic infection transmitted to Maya during the early stages of fetal development. [*Id.* at 37-39.]

The *Proffitt* panel first noted that in *Eisbrenner v Stanley,* 106 Mich App 357; 308 NW2d 209 (1981), this Court had recognized the wrongful birth tort in a case involving rubella-caused birth defects. *Proffitt, supra* at 41. The *Proffitt* panel stated that "[t]he jurisdictions considering the issue have now almost uniformly adopted the wrongful birth cause of action." *Id.* at 42.[37] The *Proffitt* panel then reviewed wrongful

---

[37] However, that seems to have been a considerable overstatement. While the *Proffitt* panel cited anno: *Tort liability for wrongfully causing one to be born,* 83 ALR3d 15, in support of its statement, that annotation in fact lists a number of cases in which courts in other jurisdictions have

birth cases from a number of other jurisdictions, including *Harbeson v Parke-Davis, Inc*, 98 Wash 2d 460; 656 P2d 483 (1983). See *Proffitt, supra* at 42-46.[38] With respect to the wrongful birth tort, the *Proffitt* panel concluded, "[a]gainst this backdrop, we conclude that the *Eisbrenner* holding with regard to wrongful birth remains the law in Michigan until changed by the Legislature or the Supreme Court." *Id.* at 46.

With respect to the wrongful life tort, however, the *Proffitt* panel reached a far different conclusion. It first noted that this Court had previously rejected this cause of action on three occasions. *Id.* at 47-50, citing *Eisbrenner, supra, Dorlin v Providence Hosp*, 118 Mich App 831; 325 NW2d 600 (1982), and *Strohmaier v Associates in Obstetrics & Gynecology*, 122 Mich App 116; 332 NW2d 432 (1982).

After reviewing these decisions and the decisions of other states regarding the wrongful life tort, the *Proffitt* panel then came to the heart of the matter:

> We begin with the proposition that the wrongful birth cause of action already exists as a valid cause of action in this state and elsewhere. It follows, then, that the reasons for accepting it have also been found to be valid. As both the wrongful birth and the wrongful life causes of action generally arise out of the same factual situation, those reasons arguably apply with equal validity and relevancy to the

---

rejected theories of liability premised on damages supposedly suffered by the parents from the "wrongful birth" of a child or by a child from the child's supposedly "wrongful life." *Id.*, § 3(b), pp 36-40.

[38] In *Harbeson*, the Washington court appeared to adopt the benefits rule in wrongful birth cases by holding that the parents could recover for the medical expenses attributable to the child's "defective condition" and for the emotional injury caused by the birth of the "defective" child *though the jury could also consider countervailing emotional benefits attributable to the birth of the child. Proffitt, supra* at 45.     .

> wrongful life cause of action. *Nevertheless, this Court has previously refused to allow a wrongful life claim to stand, the Supreme Court has refused to review that point of view, and the Legislature has not seen fit to act in this area.* Consequently we are reluctant to resolve all of the moral and public policy arguments that others at a different or higher level have declined to address. There comes a point at which three judges on an intermediate appellate court should restrain themselves from making new law. The decision whether a life with birth defects has a greater or lesser value than no life at all is beyond such a point. Consequently we will allow the law to remain where it stands. The "wrongful birth" claim in this case must go to trial and the "wrongful life" claim will remain dismissed. [*Proffitt, supra* at 57-58 (emphasis supplied).]

In our view, this mixed decision elevates the principle of *stare decisis* over all logic. It apparently escaped the *Proffitt* panel that in 1981 when this Court decided *Eisbrenner,* neither the Legislature nor the Michigan Supreme Court had recognized the wrongful birth tort. Further, although the *Proffitt* panel glanced off the point, it appeared to have made no difference to that panel that, *on exactly the same facts,* this Court was continuing to recognize the wrongful birth tort while declining to recognize the wrongful life tort.

The net result is a misshapen jurisprudence. Simply put, if Maya Proffitt, through her parents acting as her surrogates, could not bring an action for wrongful life in Michigan because neither the Legislature nor the Michigan Supreme Court has recognized the wrongful life tort, then why should those same parents be allowed to bring an action for wrongful birth *on exactly the same facts* when neither the Legislature nor the Supreme Court has recognized the wrongful birth tort? The answer—and it appears to us to be a

rather self-evident answer—is that, if there is any consistency to the law in this area, this Court should not have allowed the Proffitts to bring such a wrongful birth action. Again, to say the least, this Court's rejection of the wrongful life tort in *Eisbrenner, Dorlin, Strohmaier,* and *Proffitt* raises the most troubling of questions about the continued viability of the wrongful birth tort in Michigan.

### (4) CONCLUSION

This Court has partially repudiated the birth-related tort of wrongful conception and totally rejected the birth-related tort of wrongful life. Both of these causes of action are closely analogous to the birth-related tort of wrongful birth. Nevertheless, this Court, without any action by the Legislature or the Michigan Supreme Court, has continued to recognize the tort of wrongful birth. The resulting jurisprudence defies all logic. Below, we explore the origins of the wrongful birth tort in Michigan and respond to various arguments for its continuation.

### B. THE ORIGINS OF THE WRONGFUL BIRTH TORT IN MICHIGAN

#### (1) *EISBRENNER*

This Court first recognized the wrongful birth tort in *Eisbrenner, supra. Eisbrenner* involved facts very similar to *Proffitt.* The plaintiffs alleged that the defendant physician negligently failed to diagnose Mrs. Eisbrenner's rubella, despite the fact that the defendant had seen test results that indicated she had contracted the disease. The plaintiffs further alleged that the defendant negligently failed to warn the plaintiffs of the possibility that the child would be

born with rubella-caused defects. As in *Proffitt*, the plaintiffs contended that had the defendant acted properly, he would have informed them of the risk, and that the family would have decided to terminate the pregnancy rather than taking a chance on birth defects. *Eisbrenner, supra* at 360.

The *Eisbrenner* panel began its analysis with a review of *Gleitman v Cosgrove*, 49 NJ 22; 227 A2d 689 (1967). See *Eisbrenner, supra* at 361-362. *Gleitman* involved a child with birth-related defects apparently causally related to the viral disease of German measles that Mrs. Gleitman had early in her pregnancy. The *Gleitman* court assumed that the defendant physician had affirmatively misled Mrs. Gleitman by telling her that the German measles she had would have no effect on her child, then in gestation. The court further assumed that Mrs. Gleitman could have terminated the pregnancy in a fashion that would not have subjected the participants to criminal sanctions, but that she did not do so because she relied on the incorrect advice of the defendants. *Gleitman, supra* at 27.

Despite these assumptions, the majority of the *Gleitman* court rejected claims of both wrongful life *and* wrongful birth.[39] With respect to wrongful birth, the majority stated:

> A considerable problem is raised by the claim of injury to the parents. In order to determine their compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the

---

[39] The Court cited Theocritus: " 'For the living there is hope, but for the dead there is none.' " *Gleitman, supra* at 30.

alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform for the infant plaintiff. When the parents say their child should not have been born, they make it impossible for a court to measure their damages in being the mother and father of a defective child.

                    *      *      *

We are not here faced with the necessity of balancing the mother's life against that of her child. The sanctity of the single human life is the decisive factor in this suit in tort. Eugenic considerations are not controlling. We are not talking here about the breeding of prize cattle. It may have been easier for the mother and less expensive for the father to have terminated the life of their child while he was an embryo, but these alleged detriments cannot stand against the preciousness of the single human life to support a remedy in tort. [*Gleitman, supra* at 29-31.]

The *Eisbrenner* panel noted that the New Jersey Supreme Court had partially retreated from its position in *Gleitman*[40] and declined to follow it. *Eisbrenner, supra* at 364. Rather, after reviewing a number of cases from around the country, the *Eisbrenner* panel, relying heavily on *Troppi, supra,* held that the trial court had properly refused to dismiss the Eisbrenners' cause of action for wrongful birth. *Eisbrenner, supra* at 367-368.

We believe it critical to note that *Rouse* at least partially overruled *Troppi,* in the process stating that the benefits rule should not be applied in wrongful conception cases. Thus, we conclude that the intellectual

---

[40] See *Berman v Allan,* 80 NJ 421; 404 A2d 8 (1979), recognizing a parents' cause of action for wrongful birth, partially based on a recognition that, under *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), the mother's right to terminate the pregnancy during the first trimester was not subject to state interference.

basis in *Troppi* for the *Eisbrenner* wrongful birth decision no longer exists.

### (2) POST-*EISBRENNER* DECISIONS

We recognize, nevertheless, that this Court continued to follow—or least mention—the *Eisbrenner* decision in a number of subsequent cases.[41] The basic question, then, becomes whether this Court correctly decided *Eisbrenner* and its progeny. We conclude that these cases were wrongly decided.

### C. WRONGFUL BIRTH: A MISSHAPEN JURISPRUDENCE

### (1) MCR 7.215(H)

MCR 7.215(H) provides that this Court must follow the rule of law established by a prior published decision of the Court issued on or after November 1, 1990, that has not been reversed or modified by the

---

[41] See *Dorlin, supra* at 835 ("The *Eisbrenner* Court did find that the parents had a cause of action and they could seek damages for both medical expenses and mental distress."); *Strohmaier, supra* at 119 ("In the *Eisbrenner* opinion, the panel held that, although the parents could seek damages for both medical expenses and mental distress, the child's claim did not constitute a valid cause of action."); *Proffitt, supra* at 46 ("[W]e conclude that the *Eisbrenner* holding with regard to wrongful birth remains the law in Michigan until changed by the Legislature or the Supreme Court."); *Rinard, supra* at 290 ("A cause of action can be maintained in Michigan for failure to diagnose pregnancy."), *Rouse, supra* at 626-627 (citing *Rinard, supra,* and *Proffitt, supra,* to the effect that "[w]rongful birth is a tort action brought by parents of a child with a birth defect against a doctor or other person whose negligent failure to inform the parents of the risk of the birth defect deprived the parents of the opportunity to make an informed decision to avoid or terminate the pregnancy"); and *Blair v Hutzel Hosp,* 217 Mich App 502, 508; 552 NW2d 507 (1996), rev'd 456 Mich 877 (1997) (after discussing *Eisbrenner, Proffitt, Rinard,* and *Rouse,* holding that "[t]he trial court properly denied summary disposition of the wrongful birth claim because that is still a viable cause of action in this state").

Supreme Court or by a special conflict panel of this Court. While this Court decided *Eisbrenner, Dorlin, Strohmaier, Proffitt,* and *Rinard* before November 1, 1990, we decided *Rouse* and *Blair* after that date. Thus, unless one can distinguish these two cases or unless they have been later reversed or modified, we must apply them.

We can easily distinguish *Rouse.* The *Rouse* panel observed that Michigan case law has recognized a claim for wrongful birth based on a medical professional's failure to provide information that would have led the parents of a child to opt to terminate the pregnancy before that child was born, *Rouse, supra* at 626-627. However, this statement is dictum. The claim in *Rouse* was *not* a wrongful birth claim. Rather, it was a wrongful conception claim. The narrow issue in *Rouse,* therefore, was whether "plaintiffs, in the context of a wrongful pregnancy action, can seek to recover as part of their damages the customary cost of raising and educating the child." *Id.* at 627. Thus, the *Rouse* summary of Michigan appellate case law regarding wrongful birth was part of a background discussion of legal principles. It was unnecessary to, and indeed not a part of, the actual rationale for the decision in *Rouse.* As dicta, the statements in *Rouse* regarding wrongful birth are not binding precedent.

The decision in *Blair* stands on the same ground, but for another reason. The *Blair* panel did hold that wrongful birth claims remain viable. However, because the Supreme Court reversed, see 456 Mich 877, the decision in *Blair*—even though on other

grounds that were decisive of the entire case[42]—this Court is not required to follow it. Thus, with respect to both *Rouse* and *Blair*, MCR 7.215(H) does not stand as a bar to this Court's reconsideration of the wrongful birth tort. Therefore, we are free—albeit within the constraints of a proper regard for *stare decisis*—to reconsider the *Troppi*-based holding in *Eisbrenner* as carried forward in *Dorlin*, *Strohmaier*, *Proffitt*, and *Rinard*, all cases decided before November 1, 1990.

### (2) *ROE v WADE*

The *Proffitt* panel articulated a separate reason for continuing to recognize the wrongful birth tort:

> As long as abortion remains an option allowed by law, the physician owes a duty to furnish patients with adequate information for them to be able to decide whether to choose that course of action. *Those who would eliminate such a right of recovery must first abolish the right to have*

---

[42] We note that the only matter considered by the *Blair* panel of this Court was whether the trial court properly granted summary disposition in favor of the defendant hospital with regard to the wrongful birth claim brought by the plaintiff in that case. See *Blair, supra* at 217 Mich App 504-505. The decision of the *Blair* panel was to reverse the grant of summary disposition and remand the case for trial on the plaintiff's wrongful birth complaint. *Id.* at 512. However, the Supreme Court reversed that decision and reinstated the trial court's grant of summary disposition in favor of the defendant. *Blair, supra* at 456 Mich 877. Thus, the Supreme Court reversed the *decision* of this Court in *Blair* in its entirety, although the Supreme Court did so without addressing the *Blair* panel's discussion of the continuing vitality of the wrongful birth cause of action in Michigan. Because the Supreme Court entirely reversed the *Blair* panel's decision, we conclude that under the plain language of MCR 7.215(H)(1), nothing in the *Blair* panel's opinion is binding precedent under that subrule. We observe that MCR 7.215(H)(1) establishes a bright-line test and that such a test cannot be maintained if every opinion is to be parsed into its smallest components.

*an abortion*—a matter not germane to this appeal. [*Proffitt,
supra* at 46-47 (emphasis supplied).]

This line of argument is fundamentally erroneous.
While currently prevailing United States Supreme
Court precedent recognizes a federal constitutional
right to privacy, see *Roe v Wade*, 410 US 113; 93 S Ct
705; 35 L Ed 2d 147 (1973), and holds that this right to
privacy "protects the woman from unduly burden-
some interference with her freedom to decide
whether to terminate her pregnancy," *Maher v Roe*,
432 US 464, 473-474; 97 S Ct 2376; 53 L Ed 2d 484
(1997), this right to privacy "implies no limitation on
the authority of a State to make a value judgment
favoring childbirth over abortion." *Id.* at 474.

In particular, Michigan law provides for no right to
an abortion and, in fact, makes a value judgment
favoring childbirth. This Court has held that the Mich-
igan Constitution does not provide a right to end a
pregnancy. *Mahaffey v Attorney General*, 222 Mich
App 325, 334-339; 564 NW2d 104 (1997). On the con-
trary, the public policy of Michigan, while limited by
decisions of the United States Supreme Court, is to
forbid elective abortion. *Id.* at 337. As dissenting
Judge O'CONNELL noted in *Blair, supra* at 519, "Michi-
gan refuses to publicly fund an abortion unless the
abortion is necessary to save the life of the mother,"
citing *Doe v Dep't of Social Services*, 439 Mich 650,
678; 287 NW2d 166 (1992), and MCL 400.109a; MSA
16.490(19a). Judge O'CONNELL further observed that
"[o]ur state's public policy is manifested in numerous
other ways," citing MCL 333.17014(f) and (h); MSA
14.15(17014)(f) and (h).

Indeed, the Michigan Supreme Court has held that
federal case law imposes no obligation on govern-

ment to be neutral regarding abortion, but rather allows a state to make a value judgment favoring childbirth over abortion. *Doe, supra* at 667. The core holding in *Doe* was that the Equal Protection Clause of the Michigan Constitution does not require the state to fund abortions for women receiving public assistance, even though the state provides financial support for childbirth to similarly situated women receiving public assistance. See *id.* at 681-682. Because the state has no obligation to affirmatively aid a woman in obtaining an elective abortion by paying for it, the state similarly has no obligation to take the affirmative step of imposing civil liability on a party for failing to provide a pregnant woman with information that would make her more likely to have an elective, and eugenic,[43] abortion.

In reality, then, wrongful birth cases are not abortion cases. If the United States Supreme Court had never decided *Roe v Wade*, the *Eisbrenner* decision in Michigan would have been the same, because it takes its basic rationale from *Troppi*, a pre-*Roe v Wade* decision. Conversely, eliminating the tort of wrongful birth in Michigan would have no effect whatever on the federal constitutional right that the *Roe v Wade* Court recognized.[44]

---

[43] The concurrence in *Gleitman, supra* at 44, defined a "eugenic abortion" as one based on the probability or possibility that the fetus may be born in a mentally or physically abnormal condition. By contrast, the concurrence defined a "therapeutic abortion" as an induced interruption of a pregnancy, the continuance of which will jeopardize the life or health of the mother. *Id.*

[44] We also note the inherent proof problem in making a finding that an abortion would have occurred had the parents been informed of the child's potential disability. In this regard, *Weymers v Khera*, 454 Mich 639, 649; 563 NW2d 647 (1997), considered the "doctrine of lost opportunity," which allows for recovery when a defendant's negligence "possibly" (i.e.

### (3) THE SLIPPERY SLOPE OF THE BENEFITS RULE

At its intellectual core, the wrongful birth tort this Court created in *Eisbrenner* relies on the benefits rule this Court adopted in *Troppi*. To say the very least, continued reliance on this rule has some far-reaching, and profoundly disturbing, consequences. This rule invites the jury in wrongful birth cases to weigh the costs to the parents of a disabled child of bearing and raising that child against the benefits to the parents of the life of that child. This rule thus asks the jury to quantify the unquantifiable with respect to the benefits side of the equation. Further, to posit a specific question: how does a jury measure the benefits to the parents of the *whole life* of the disabled child, when the potential of that child is unknown at the time of suit? How, for example, would a hypothetical Grecian jury, operating under Michigan jurisprudence, measure the benefits to the parents of the *whole life* of Homer, the blind singer of songs who created the *Iliad* and the *Odyssey*? Absent the ability to foretell the future and to quantify the value of the spoken and then the written word, how, exactly, would the jury do that?

Further, the use of the benefits rule in wrongful birth cases can slide ever so quickly into applied eugenics. The very phrase "wrongful birth" suggests that the birth of the disabled child was wrong and

---

with a probability of fifty percent or less) caused the plaintiff's injury. The Court ultimately held that no cause of action exists for the loss of an opportunity to avoid physical harm less than death, *id.*, in the process stating that it refused "to discard causation" in negligence actions of the type there presented, *id.* at 653. In wrongful birth actions, we note the difficulty in finding causation based on after-the-fact, possibly self-serving, testimony that the parents would have sought an abortion had they known of the child's potential disability.

should have been prevented. If one accepts the premise that the birth of one "defective" child should have been prevented, then it is but a short step to accepting the premise that the births of classes of "defective" children should be similarly prevented, not just for the benefit of the parents but also for the benefit of society as a whole through the protection of the "public welfare." This is the operating principle of eugenics. James E. Bowman[45] provides a dark, single sentence description of eugenics: "Eugenics espouses the reproduction of the 'fit' over the 'unfit' (positive eugenics) and discourages the birth of the 'unfit' (negative eugenics)."[46] Paul A. Lombardo more broadly, and more charitably, defines eugenics as the idea that the human race can be gradually improved and social ills simultaneously eliminated through a

---

[45] See Bowman, *The road to eugenics*, 3 U Chic L Sch Roundtable 491 (1996).

[46] Bowman goes on to amplify his description:

The delineation of the "fit" from the "unfit" is ancient. Ancient Greeks proposed to control mating among the guardian (upper) class to ensure that the offspring would produce the "best and the brightest." In Plato's *Republic*, Socrates explores the idea that "a life spent in the doctor's hands is not worth having," that medicine should only be practiced on those who have healthy constitutions and healthy habits; and "weak" parents should not be allowed to have "weak" children. The American Eugenics Movement in the 1920s targeted as "unfit" individuals with epilepsy, criminals, the crippled and deformed; persons who were mentally defective or who had low intelligence; patients with communicable diseases such as syphilis, tuberculosis, or leprosy; alcoholics and drug abusers; poor people; and Eastern European immigrants to the United States. The Nazis marked Jews, Gypsies, and other so-called non-Aryan peoples, individuals who were mentally defective, and persons with incurable or mental illnesses—to name a few. In the heyday of eugenics, sterilization, infanticide, euthanasia, or a variety of "final solutions" were tools for the prevention or elimination of the "unfit." [*Id.* at 492.]

program of selective procreation[47] and describes its most enthusiastic American advocates:[48]

> Francis Galton, Karl Pearson, and others who called themselves eugenicists believed in improving the human condition through the use of science. They understood their field as the marriage of the biological sciences, including medical genetics, with the then new discipline of biostatistics. The most passionate of American eugenicists, such as Charles Davenport and Harry Laughlin, wished to develop a taxonomy of human traits and to categorize individuals as "healthy" or "unhealthy," and "normal" or "abnormal," within their classification scheme. Working under the presumption that most, if not all, human traits are transmitted genetically, the eugenicists encouraged educated, resourceful, and self-sufficient citizens to mate and produce "wellborn" eugenic children. In contrast, the dysgenic were discouraged from reproducing. Harry Laughlin called dysgenic groups "socially inadequate" and defined them to include: the feebleminded, the insane, the criminalistic, the epileptic, the inebriated or the drug addicted, the diseased—regardless of etiology, the blind, the deaf, the deformed, and dependents (an extraordinarily expansive term that embraced orphans, "ne'er-do-wells," tramps, the homeless and paupers.)

To our eyes, this concept appears simultaneously cruel and laughable, but we should remember that the concept, and the values, of eugenics had a profound effect on American society. We should also recall that the courts were not above the use of this type of rhetoric. One of the most respected jurists in American history, Justice Oliver Wendell Holmes, wrote the

---

[47] See Lombardo, *Medicine, eugenics and the Supreme Court: From coercive sterilization to reproductive freedom*, 13 J Contemp Health L & Pol'y 1-2 (1996).

[48] *Id.* at 2-3.

decision in *Buck v Bell*, 274 US 200; 47 S Ct 584; 71 L Ed 1000 (1927). As Lombardo describes the opinion:[49]

> Justice Holmes borrowed language directly from the Virginia law's preamble, and repeated its conclusion that "experience has shown that heredity plays an important part in the transmission of insanity, [and] imbecility. . . ." Holmes then endorsed the law's procedures and approved the reasoning and result in the Virginia courts that reviewed the law, concluding with one of the most callous and elitist statements in Supreme Court history: "[i]t is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind." In singling out the helplessly dependent genetic imbecile and the congenitally deficient criminal, Holmes emphasized the genetic determinism that eugenic theory had incorporated. Holmes' choice of a public health law analogy wedded the imagery of a plague with the idea of cleansing the social fabric through sterilization; "[t]he principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes." This statement suggests that wiping out an epidemic with a vaccine was comparable to wiping out crime and mental disease with sterilization. Justice Holmes' most dramatic statement in the opinion included a memorable comment that posed a seemingly irrefutable public policy conclusion: "three generations of imbeciles are enough."

Finally, we should not forget the influence that the Third Reich's experiments with sterilization had on the American eugenics movement. As Lombardo[50] notes, Dr. Joseph DeJarnette, who testified as an expert witness in the *Buck* trial, made the following comments about those experiments:

---

[49] *Id.* at 10-11.
[50] *Id.* at 11-12.

> No person unable to support himself on account of his inherited mental condition has a right to be born. . . . In Germany the sterilization law embraces chronic alcoholics, certain hereditary physical diseases, the hereditarily blind and deaf, the criminally insane, feebleminded and epileptic. [B]y December 31, 1934 Germany had sterilized 56,224 [persons].

Lombardo[51] notes that Dr. DeJarnette continued to express his admiration for Hitler's campaign in the good doctor's last official comment regarding sterilization in 1938:

> Germany in six years has sterilized about 80,000[52] of her unfit while the United States with approximately twice the population has sterilized about 27,869 to January 1, 1938, in the past 20 years. The death rates in Virginia from sterilization is [sic] negligible—not over one in a thousand. . . . The fact that there are 12,000,000 defectives in the United States should arouse our best endeavors to push this procedure to the maximum.

To our ears, at the close of the twentieth century, this talk of the "unfit" and of "defectives" has a decidedly jarring ring; we are, after all, above such lethal nonsense. But are we? We know now that we all have at least five potentially destructive recessive genes but, according to Bowman,[53] when scientists map the human genome, they will unveil many more potentially harmful genes in each of us. Bowman states that "[p]sychoses, hypertension, diabetes, early- and late-appearing cancers, degenerative disorders, sus-

---

[51] *Id.* at 12.

[52] Lombardo notes that the Nazi program eventually claimed between 360,000 and 3,500,000 victims, commenting that "the numbers are elusive." *Id.*

[53] Bowman, *supra* at 492-493.

ceptibility genes for communicable diseases, genes for various mental deficiencies,[54] aging genes, and other variations and disorders will be ascertained." Will we then see the tort of wrongful birth extended to physicians who neglect or misinterpret genetic evidence and thereby fail to extend the option of a eugenic abortion to the unsuspecting parents of a genetically "unfit" and "defective" child? Our current acceptance of the wrongful birth tort would require the answer to this question in Michigan to be: yes.

We further note that it is but another short half step from the concept of preventing the birth of an "unfit" or "defective" child to proposing, for the benefit of the child's overburdened parents and of the society as a whole, that the existence of the child should not be allowed to continue. Again, this sounds preposterous, but is it? As described by Bowman:[55]

> Daniel Callahan, the former President and Founder of the Hastings Center, the preeminent center for bioethics in the United States, has proposed age-based rationing of health

---

[54] Bowman notes:

Kay Jamison, Professor of Psychiatry at Johns Hopkins Medical School, who also serves on the National Advisory Committee for Human Genome Research, discovered an incidence of manic depressive illness among poets, composers, and other artists of from 30 to 50 percent. If we are ever able to prevent manic depressive illness by prenatal diagnosis and abortion—or cure manic depressive illness—there could be a detrimental effect on creativity. Samuel Coleridge Taylor, Emily Dickinson, T. S. Eliot, Victor Hugo, Samuel Johnson, Edna St. Vincent Millay, Ezra Pound, Edgar Allan Poe, Alfred Lord Tennyson, Walt Whitman, Hans Christian Anderson, Honore de Balzac, Charles Dickens, William Faulkner, Hector Berlioz, Handel, Gustav Mahler, Rachmaninoff, Rossini, Tchaikovsky, Irving Berlin, Cole Porter, Charles Parker, Paul Gaugin, Vincent van Gogh, Michelango, and Jackson Pollock could have been on an unfit hit list. [*Id.* at 514.]

[55] *Id.* at 503.

care for elderly persons to alleviate escalating health care costs. Pain relief would be in order, but not life-saving measures, *including nutrition*. In short, aged individuals past their late seventies or early eighties should go quietly into the night in order that the generation to follow would have access to health care—in their early years. [Emphasis supplied.]

If the elderly have a duty to die—indeed, to be starved to death—then why not the disabled child? After all, if that child never should have been born, then that child has no real right to go on living, thereby imposing the costs of the child's continued existence on the parents and society. This, we conclude, is the logical end of the slippery slope inherent in the application of the benefits rule through the wrongful birth tort.

(4) CONCLUSION

We conclude that this intermediate appellate court should not continue to recognize the wrongful birth tort without the slightest hint of approval from the Michigan Supreme Court or our Legislature. At least five states[56] have taken legislative action to prohibit "wrongful birth" suits while one state[57] has taken legislative action to permit such suits. If society is to recognize such a tort, it should do so through the action of a majority of the legislature, whose role it is to set social policy. We therefore reconsider our pre-1990 decisions establishing the wrongful birth tort

---

[56] Idaho (see Idaho Code 5-334); Minnesota (see Minn Stat Ann 145.424); Missouri (see Mo Ann Stat 188.130); Pennsylvania (see 42 Pa Cons Stat Ann 8305); and South Dakota (see SD Cod Laws Ann 21-55-2).

[57] Maine (see Me Rev Stat Ann, tit 24, § 2931[2]).

and hold that, as a matter of law, it has no continued place in our jurisprudence.

We recognize that our decision to abolish a tort cause of action for "wrongful birth" marks a substantial change from the rule of law in force since the decision in *Eisbrenner, supra*, in 1981. In determining whether to give an opinion that has the effect of changing a rule of law complete retroactive effect, we should consider (1) the purpose served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactive application on the administration of justice. *Lincoln v General Motors Corp*, 231 Mich App 262, 267-268; 586 NW2d 241 (1998). While we believe our rejection of a tort cause of action for "wrongful birth" to be a much sounder rule of law than the previous recognition of a wrongful birth tort, we also recognize that the tort was recognized for a period of many years and that attempts to apply our decision to pending litigation might have a disruptive effect on the administration of justice. Accordingly, our holding is to apply to this case (because application of the holding to this case, which our panel was already considering, will not be disruptive to the administration of justice) and to bar any cause of action for wrongful birth in a complaint filed after the release of this opinion. See *Parker v Port Huron Hosp*, 361 Mich 1, 28; 105 NW2d 1 (1960) (applying a new rule of law in a civil case "to the instant case and to all future causes of action arising after September 15, 1960, the date of the filing of this opinion").[58]

---

[58] Contrary to our colleague's statement in his separate concurrence and dissent, our decision to abolish the tort of wrongful birth is not "merely dictum with no precedential value." *Post* at 361. Rather, we decide this case with two alternative holdings, neither of which may be

D. THE STATUTE OF LIMITATIONS

Here, the Taylors' wrongful birth claim was essentially a claim of medical malpractice. *Dorlin, supra* at 836. A plaintiff in a medical malpractice action must bring the claim within two years of when the claim accrued, or within six months of when the plaintiff

---

considered dictum because both are equally decisive: (1) we affirm the trial court's grant of summary disposition in favor of defendants with regard to the wrongful birth claim because the tort of wrongful birth is abolished, and (2) we affirm the trial court's grant of summary disposition in favor of defendants with regard to the wrongful birth claim because the wrongful birth claim is barred by the statute of limitations. See *Woods v Interstate Realty Co*, 337 US 535, 537; 69 S Ct 1235; 93 L Ed 1524 (1949) ("where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum"); see also *Vaught v Showa Denko KK*, 107 F3d 1137, 1144 (CA 5, 1997). We note, in light of our colleague's concern about wasting judicial time and resources, that our decision to resolve this case with two alternative holdings may serve the goal of judicial economy. In the event that the Michigan Supreme Court should decide to review this case and decides that we erred with regard to one of our two central holdings, the Court will have the benefit of our analysis with regard to the other holding, thereby conserving judicial resources in that forum.

We acknowledge that the parties did not directly raise the issue whether the tort of wrongful birth should continue to be recognized in Michigan. However, "this Court may go beyond the issues raised on appeal and address issues that, in this Court's opinion, justice requires be considered and resolved." *Frericks v Highland Twp*, 228 Mich App 575, 586; 579 NW2d 441 (1998). When a claim in a case is premised on an alleged tort, whether the tort theory underlying that claim should even be recognized as a matter of law is a basic and controlling issue in the case. Further, for the reasons we have discussed at length, recognition of a tort cause of action for wrongful birth is fundamentally unsound. We conclude that "justice requires," *id.*, that we take this opportunity to consider the basic issue whether Michigan should recognize a cause of action for "wrongful birth."

As for the charge of "unnecessary judicial activism," *post* at 363, we welcome our colleague's apparent acceptance of the view that such activism is to be avoided and observe that the creation of the wrongful birth cause of action was, in the first instance, entirely a judicial act by an intermediate appellate court. We do not view the abolition of that cause of action, which has never been recognized by our Legislature or our Supreme Court, to be an example of judicial activism.

discovered or should have discovered the claim, whichever is later.[59] MCL 600.5805(4); MSA 27A.5805(4), MCL 600.5838a(2); MSA 27A.5838(1)(2); *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 219; 561 NW2d 843 (1997). Because it is undisputed that the Taylors' wrongful birth claim is based on medical malpractice, the date of the accrual of the claim is governed by MCL 600.5838a(1); MSA 27A.5838(1)(1); *Dorlin, supra* at 836. A medical malpractice claim accrues "at the time of the act or omission that is the basis for the claim of medical malpractice, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." MCL 600.5838a(1); MSA 27A.5838(1)(1); *Solowy, supra* at 220. Here, the act or omission that formed the basis of the Taylors' claim was Kurapati's interpretation of the ultrasound on December 4, 1993. Thus, the Taylors had until December 4, 1995, to file their claim. By filing their initial complaint on March 26, 1996, the Taylors failed to file within the applicable limitation period and summary disposition was appropriate.

The Taylors maintain that a wrongful birth claim does not accrue until the birth of the child. It is true that a tort action generally accrues when all of the necessary elements of the cause of action have occurred and can be pleaded in a complaint. *Luick v Rademacher*, 129 Mich App 803, 806; 342 NW2d 617 (1983). However, our Legislature created an exception to that general rule in the case of medical malpractice actions when it enacted MCL 600.5838a(1); MSA 27A.5838(1)(1). Again, under Michigan law, a

---

[59] The six-month period is not at issue here, where Brandy Taylor admitted that she suspected that the ultrasound was negligently interpreted as early as the summer of 1994.

medical malpractice claim accrues at the time of the act or omission that is the basis of the claim *regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.* MCL 600.5838a(1); MSA 27A.5838(1)(1) (emphasis supplied). Therefore, we find no merit in the Taylors' assertion that their claim accrued upon the birth of the child. The Taylors further argue that their wrongful birth claim accrued on the last date that Brandy Taylor could have obtained an abortion. However, the Taylors have offered no authority in support of their position. MCL 600.5838a(1); MSA 27A.5838(1)(1) is controlling with respect to the accrual date. *Dorlin, supra* at 836.

### III. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The Taylors argue that the trial court erred in granting defendants' motion for summary disposition with respect to their claim of negligent infliction of emotional distress where they suffered severe emotional distress witnessing the birth of their child. We disagree. Defendants moved for summary disposition of the negligent infliction of emotional distress claim pursuant to MCR 2.116(C)(7), (8), and (10). The order granting summary disposition did not indicate under which subrule of MCR 2.116 the trial court granted defendants' motion. We conclude that summary disposition was appropriate under both MCR 2.116(C)(8) and (10).

A motion for summary disposition pursuant to MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone. *Jackson v Oliver,* 204 Mich App 122, 125; 514 NW2d 195 (1994). All factual allegations in support of the claim must be accepted as true, as well as any reasonable inferences that can be drawn

from the facts. *Id.* The motion should be granted only where the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery. *Id.* A motion for summary disposition pursuant to MCR 2.116(C)(10) tests the factual support for a claim and may be granted when, except for the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment or partial judgment as a matter of law. *Michigan Mut Ins Co v Dowell*, 204 Mich App 81, 85; 514 NW2d 185 (1994). The court must consider the documentary evidence submitted by the parties and, giving the benefit of reasonable doubt to the nonmoving party, must determine whether a record might be developed that would leave open an issue with regard to which reasonable minds might differ. *Id.*

A plaintiff may recover for negligent infliction of emotional distress where (1) the injury threatened or inflicted on the third person is a serious one, of a nature to cause severe mental disturbance to the plaintiff, (2) the shock results in actual physical harm, (3) the plaintiff is a member of the third person's immediate family, and (4) the plaintiff is present at the time of the accident or suffers shock "fairly contemporaneous" with the accident. *Wargelin, supra* at 81. The Taylors' claim is fatally flawed where both the parents acknowledged that they did not see their child's disabilities at or immediately after her birth. Brandy Taylor's deposition testimony indicated that she did not know anything was wrong with Shelby Taylor and that the doctors swept the child out of the room before she had the chance to see her. Brian Taylor testified that he noticed something about Shelby Taylor's arm, but that the child was taken out of the

room before he could notice more of the disabilities.
The Taylors' physician was able to discuss the child's
disabilities with the Taylors before they saw her. The
undisputed facts of this case do not support a claim
of negligent infliction of emotional distress. Cf.
*Wargelin, supra* at 86-88. Thus, summary disposition
was appropriate pursuant to MCR 2.116(C)(10). In
addition, the Taylors failed to allege that the shock of
Shelby Taylor's birth caused them actual physical
harm. Therefore, summary disposition pursuant to
MCR 2.116(C)(8) was also appropriate. *Id.*

Affirmed.

SMOLENSKI, J., concurred.

DOCTOROFF, P.J. (*concurring in part and dissenting
in part*). I concur with the majority's conclusion that
plaintiffs' wrongful birth claim is barred by the stat-
ute of limitations and with the majority's resolution of
plaintiffs' negligent infliction of emotional distress
claim. However, I dissent from the majority opinion
with respect to its purported abolition of the wrong-
ful birth tort where this Court's recognition of that
tort was not challenged by the parties or decided by
the trial court.

First, the majority's attempt to abolish the wrongful
birth tort is in vain where its discussion with respect
to whether this Court should continue to recognize
that tort, and its purported abolition of the tort, is
merely dictum with no precedential value.
"[S]tatements concerning a principle of law not essen-
tial to determination of the case are obiter dictum
and lack the force of an adjudication." *Roberts v
Auto-Owners Ins Co*, 422 Mich 594, 597-598; 374
NW2d 905 (1985). In the instant case, defendants

moved for summary disposition on the ground that plaintiffs' wrongful birth claim was barred by the statute of limitations. Thus, with respect to the wrongful birth claim, the only issue before us was whether the wrongful birth claim was barred by the statute of limitations. A review of the complaint, the answers to the complaint, the affirmative defenses, the dispositive motions, the transcript of the summary disposition motion hearing, the claim of appeal, and the appellate briefs reveals that this Court's recognition of the wrongful birth tort was never challenged by the parties. The only determination essential to the narrow issue raised by the parties with respect to the wrongful birth claim was whether plaintiffs' complaint was filed within the applicable statute of limitations period. A discussion of the history of the wrongful birth tort and related torts, and a conclusion that we should no longer recognize wrongful birth claims, was not essential to the determination of this case and was, in my opinion, a waste of judicial time and resources where, as dicta, the discussion and conclusion are of no precedential value.

Moreover, the majority's conclusion that the wrongful birth tort should be abolished was made without the aid of briefing or argument by the parties. "It is well settled that issues neither briefed nor argued cannot be definitively decided, and that the Court's pronouncements, especially dicta, without briefing and argument, are not stare decisis." *Quinton v General Motors Corp*, 453 Mich 63, 74; 551 NW2d 677 (1996) (Levin, J). This is an appellate court that is intended to review issues raised by the parties, and it is not the job of this Court to manufacture issues to be decided. The majority does not limit its review to

issues raised or considered below, but takes it upon itself to formulate an issue and then decide that issue when it has not been asked to do so. The majority's opinion is an exercise in futility, which should be avoided by this Court. Our caseload and workload are significant enough without judges manufacturing issues that are irrelevant to the issues raised and briefed by the parties. The material included in the majority opinion is best reserved for an article in a legal periodical, where a judge is free to write about issues of concern to the judge. An opinion that is written for the benefit of parties and lawyers is not the proper place for a judge to voice the judge's own views. This is unnecessary judicial activism, which is usually scorned by the majority. I would have decided plaintiffs' argument that their wrongful birth claim was barred by the statute of limitations on that narrow ground, alone. The consideration of whether this Court should continue to recognize wrongful birth claims should be left for a day when that issue is before us. Thus, because the issue was not raised, briefed, or argued by the parties below or on appeal, I cannot join in the majority opinion to the extent that it discusses whether this Court should continue to recognize a wrongful birth cause of action and concludes that it should not.

Nevertheless, I concur with the majority with respect to its conclusion that the trial court properly granted summary disposition of plaintiffs' wrongful birth and negligent infliction of emotional distress claims. I agree that plaintiffs' wrongful birth claim accrued when defendant Kurapati interpreted the ultrasound on December 4, 1993, and that, by failing to bring their claim within two years of the date their

claim accrued, plaintiffs failed to file their claim within the applicable statute of limitations period. MCL 600.5805(4); MSA 27A.5805(4), MCL 600.5838a(2); MSA 27A.5838(1)(2). Thus, I concur with the majority to the extent that it addresses the statute of limitations issue and concludes that summary disposition was proper on that basis pursuant to MCR 2.116(C)(7). I further concur with the majority's resolution of plaintiffs' negligent infliction of emotional distress claim. The undisputed facts did not support a claim of negligent infliction of emotional distress, and plaintiffs failed to allege that the shock of their daughter's birth caused them physical harm. Thus, summary disposition was appropriate pursuant to MCR 2.116(C)(8) and (10).